El Pueblo de Puerto Rico, demandante y apelante, *v.* The Shell Company (Puerto Rico) Limited, et als., acusados y apelados.

Núm. 7482.—*Sometido:* Mayo 12, 1939. *Resuelto:* Febrero 6, 1940.

58

*Hon. Procurador General B. Fernández García, Enrique Córdova Díaz, Subprocurador* y *R. A. Gómez, Fiscal* de este Tribunal, *Miguel Guerra Mondragón* y *Rafael Rivera Zayas,* abogados asociados, abogados todos del apelante; *Jaime Sifre, Jr.,* y *Antonio J. Malla, James R. Beverley, R. Castro Fernández* y *Ryder Patten, Hartzell, Kelley & Hartzell* y *Rafael O. Fernández, José López Baralt* y *José Carbia Miranda,* abogados, respectivamente, de varios de los apelados.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El Pueblo de Puerto Rico apela de una resolución dictada por la Corte de Distrito de San Juan declarando con lugar las excepciones perentorias y desestimando la acusación presentada contra los apelados.

En 13 de julio, 1934, el Fiscal de Distrito de San Juan radicó una acusación enmendada contra las corporaciones e individuos arriba mencionados, imputándoles una infracción de las disposiciones de la ley insular titulada "Ley para proteger el comercio contra coacciones y monopolios," aprobada el 14 de marzo de 1907 (Comp. 2373–2379). Las alegaciones principales de la referida acusación leen así:

"Y el fiscal alega que las antes mencionadas corporaciones, dentro del período de tiempo, según se ha hecho constar en esta acusación, se combinaron y confabularon, unas con otras, ilegal, voluntaria y maliciosamente y en un plan común, previamente concertado y convenido entre ellas, con el único fin de cohibir e impedir la legal y libre competencia entre dichas corporaciones, y la legal y libre competencia en el tráfico y comercio, y en la contratación del negocio de distribución y venta de gasolina en el distrito judicial de San Juan y en la municipalidad de San Juan, jurisdicción de esta corte; y tal plan común y tal propósito así concertado y convenido fué ejecutado y llevado a la práctica por medio de los agentes, representantes y empleados, cuyos nombres se han consignado en el segundo párrafo de esta acusación, . . ."

"Y el fiscal alega que tales corporaciones, y tales agentes, *managers*, representantes y empleados, para ejecutar y llevar a la práctica el plan común concertado y convenido de mutuo acuerdo, con anterioridad a la iniciación de este procedimiento y dentro del período de tiempo, según antes se ha expresado, ilegal, voluntaria y maliciosamente, convinieron y acordaron la fijación, de tiempo en tiempo, de precios uniformes y arbitrarios, a que debía venderse, al por mayor y al detall la gasolina en el municipio de San Juan y en el distrito judicial del mismo nombre, y de ese modo, en virtud de tal convenio, fijaron, mantuvieron, impusieron y exigieron, precios uniformes, y han continuado y continúan ilegalmente manteniendo y exigiendo dichos precios uniformes y arbitrarios y obteniéndolos de los consumidores; . . . ."

Continúa alegando la acusación que como parte de dicho plan común las corporaciones acusadas convinieron en vender y suplir gasolina solamente a aquellos traficantes al detall que se comprometieron a venderla al precio único fijado por dichas corporaciones; que éstas lograron obtener la conformidad de los detallistas a vender únicamente a los precios por ellas fijados; que para lograr el éxito de su plan común, las corporaciones acusadas se confabularon entre sí y con los detallistas antes mencionados en la imposición de castigos y multas a todo traficante que vendiera a un precio más bajo que el fijado por dichas corporaciones, consistentes tales multas en la suspensión temporal del suministro de gasolina al castigado, unas veces, y otras en la suspensión definitiva del suministro de gasolina al castigado, hasta eliminarlo del negocio.

Los acusados excepcionaron la acusación por los siguientes fundamentos:

1. Que la acusación imputa más de un delito, en violación del Artículo 77 del Código de Enjuiciamiento Criminal de Puerto Rico.

2. Que la Corte de Distrito de San Juan carece de jurisdicción para conocer del proceso:

(*a*) Porque la ley de marzo 14, 1907, supra, cesó de estar en vigor cuando el Congreso de los Estados Unidos adoptó la ley titu-

lada "An Act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes" aprobada el 16 de junio de 1933, por el Presidente de los Estados Unidos.

(b) Porque la susodicha ley de marzo 14, 1907, supra, también cesó de estar en vigor cuando se aprobó en agosto 19, 1933, el "Código de Competencia Razonable" bajo las disposiciones de la "Ley de Rehabilitación Industrial Nacional" que estaba en vigor en Puerto Rico durante el tiempo cubierto por la segunda acusación enmendada, y cuando la Asamblea Legislativa de Puerto Rico enactó la ley núm. 2, aprobada por el Gobernador de Puerto Rico el 15 de agosto de 1933.

(c) Porque si dicha ley para proteger el comercio contra coacciones y monopolios, estuvo en vigor en alguna ocasión después del 16 de junio de 1933, lo que los acusados niegan, dicha ley cesó de estar en vigor cuando se aprobaron las modificaciones para Puerto Rico del "Código de Competencia Razonable para la Industria Petrolera" bajo las disposiciones de la susodicha "Ley de Rehabilitación Industrial Nacional" de junio 16, 1933.

(d) Porque aún asumiendo que dicha ley estuviera en vigor y que los cargos inputados fueran ciertos, dichos actos fueron sancionados por la ley del Congreso titulada "An Act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," aprobada el 16 de junio, 1933; por el "Código de Competencia Razonable para la Industria del Petróleo" aprobado por el Presidente de los Estados Unidos en agosto 19, 1933, y las modificaciones de dicho Código aprobadas el 27 de marzo de 1934, y por la ley núm. 2 de la Asamblea Legislativa de Puerto Rico, aprobada el 15 de agosto de 1933; y que esta sanción actúa en carácter de indulto legislativo total y completo, convirtiendo en legal lo que anteriormente pudiera haber sido ilegal.

(e) Porque los hechos alegados en la segunda acusación enmendada no constituyen delito público.

El 23 de agosto de 1938 la corte de distrito dictó resolución declarando con lugar las excepciones perentorias y ordenando el sobreseimiento del proceso, y contra dicha resolución El Pueblo de Puerto Rico ha instruído el presente recurso.

El apelante alega que la corte de distrito cometió los siguientes errores:

1. Al resolver que la ley local contra coacciones y monopolios de marzo 14, 1907, no estaba en vigor en marzo 19, 1934, fecha en que se radicó la acusación original, fundándose en que dicha ley local fué suspendida y dejó de estar en vigor al aprobarse la "Ley de Rehabilitación Industrial Nacional" por el Congreso de los Estados Unidos en junio 16, 1933, y al aprobarse también por la Asamblea Legislativa de Puerto Rico la ley núm. 2 de agosto 15, 1933.

2. Al tomar conocimiento judicial de que el Presidente de los Estados Unidos a virtud de la autorización concedídale por la "Ley de Rehabilitación Industrial Nacional" aprobó en agosto 19, 1933, un código titulado "Código de Competencia Razonable para la Industria Petrolera," y del hecho de que el Administrador del "Código de Competencia Razonable para la Industria Petrolera" aprobó en marzo 27, 1934, un código titulado "Código de Competencia Razonable para la Industria Petrolera en Puerto Rico."

3. Al—asumiendo que la corte pudiera haber tomado conocimiento judicial de la aprobación de dichos códigos—no resolver que dichos códigos no autorizaban los actos imputados en la acusación enmendada.

4. Al declarar con lugar la excepción perentoria y ordenar el archivo y sobreseimiento del proceso.

 En el presente recurso no están envueltas la constitucionalidad y validez de la legislación local contra monopolios. Esa cuestión fué resuelta de manera definitiva por la Corte Suprema de los Estados Unidos en el caso de *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 82 L. Ed. 235.

La cuestión fundamental sometida a nuestra consideración es qué efecto tuvieron en la ley local sobre monopolios (*a*) la "Ley de Rehabilitación Industrial Nacional" de junio 16, 1933 (48 Stat., Part 1, Ch. 90, p. 195; 15 USCA., Secs. 701–712), (*b*) La Ley núm. 2 de la Asamblea Legislativa de Puerto Rico de agosto 15, 1933 (Leyes de 1933 (2) pág. 15), y (*c*) los Códigos de Competencia Razonable para la Industria Petrolera.

Las partes pertinentes de la opinión emitida por la corte inferior leen así:

"Es de conocimiento judicial que bajo la autoridad que le confería la ley al Presidente de los Estados Unidos, éste aprobó, en agosto 19, 1933, el código titulado "Code of Fair Competition for the Petroleum Industry". También se aprobó y promulgó el Código de Competencia Razonable para la Industria Petrolera en Puerto Rico en 27 de marzo de 1934, por Harold L. Ickes, Administrador del Código de Competencia Razonable para la Industria Petrolera.

"Tanto las leyes antimonopolistas de los Estados Unidos, como la ley de 14 de marzo de 1907 de Puerto Rico, quedaron suspendidas y sus efectos paralizados al aprobarse la National Industrial Recovery Act, del Congreso de los Estados Unidos, adoptada con el fin de dar paso al vasto programa de rehabilitación industrial que era y es la meta viva de la administración del actual Presidente de los Estados Unidos Franklin D. Roosevelt y poner fin, entre otras cosas, al estado caótico de los negocios. Y si alguna duda quedara en la mente del juzgador, fué disipada con la mera lectura de la ley adoptada por la Legislatura de Puerto Rico y aprobada por el Gobernador de Puerto Rico en 15 de agosto de 1933, titulada "Ley para declarar la norma que deberá seguirse en vista del estado de emergencia prevaleciente y que causa desempleo y desorganización en las industrias; para eximir ciertas leyes de las disposiciones de las leyes contra los monopolios, vigentes en Puerto Rico, y para otros fines." La Sección 2 de esta ley dispone:

" 'Mientras la Ley del Congreso aprobada en 16 de junio de 1933 para estimular la rehabilitación industrial nacional, fomentar la competencia razonable, disponer lo necesario para la construcción de ciertas obras públicas de utilidad, y para otros fines, conocida también como la Ley de Rehabilitación Industrial Nacional, esté en vigor y durante los siguientes sesenta días, cualquier código, convenio, o licencia aprobada, prescrita o expedida y que esté en vigor de acuerdo con el Título I de dicha ley, y cualquiera acción que se haya tomado en cumplimiento de las disposiciones de la misma, durante dichos períodos, estarán exentos de las disposiciones de las leyes contra monopolios en vigor en Puerto Rico y especialmente de las disposiciones de la ley "Para proteger el comercio contra coacciones y monopolios", aprobada en 14 de marzo de 1907.'

"Según los principios generales del derecho y de la jurisprudencia, cuando una ley de carácter penal es derogada o suspendida en sus efectos, las penalidades que ella imponía no pueden hacerse efec-

tivas por infracciones cometidas mientras la misma estaba en vigor, a menos que la ley que la suspenda o derogue así lo disponga de manera clara y directa. 16 C. J. 70, 72; *State* v. *Mitchell,* 110 Texas 498; *United States* v. *Chambers,* 291 U. S. 217, 78 L. Ed. 763. Esta doctrina ha sido aceptada en Puerto Rico en *Ex Parte Mauleón,* 4 D.P.R. 123 (2da. ed.) y en *El Pueblo* v. *Alvarez,* 47 D.P.R. 757. La ley bajo la cual se procesa a un individuo debe estar en vigor tanto al cometerse el acto que motiva la acusación, como al tiempo de ésta. (Citas.)

‘‘ \* \* \* \* \* \* \*

‘‘Convenimos en que la ley no fué hecha para proteger la comisión de actos ilegales. Pero para que un acto sea ilegal tiene que haber una ley que así lo declare. Si como antes se ha expresado las leyes antimonopolistas federales y las de los territorios quedaron en suspenso, precisamente en lo que respecta a los actos imputados, o sea de vender el petróleo a un precio uniforme y fijo, tales actos dejaron de ser ilegales para convertirse en lícitos.

‘‘ \* \* \* \* \* \* \*

‘‘Es cierto que el Código de Competencia Razonable para la Industria Petrolera en Puerto Rico no fué aprobado y promulgado hasta el 27 de marzo de 1934, o sea 8 días después de presentada la acusación original, pero es cierto también que desde 16 de junio de 1933, que se aprobó por el Presidente de los Estados Unidos la Ley de Rehabilitación Industrial Nacional, y más especialmente desde el 15 de agosto de 1933, que se aprobó por el Gobernador de Puerto Rico la Ley para declarar la norma del estado de emergencia, etc., las leyes contra monopolios en los Estados Unidos, incluso Puerto Rico, quedaron suspendidas.’’

Es evidente que la corte inferior procedió a declarar con lugar las excepciones perentorias y a ordenar el archivo y sobreseimiento de la acusación, en la teoría de que el efecto ineludible y automático de la sección 5 de la Ley de Rehabilitación Industrial Nacional (15 U.S.C.A. sec. 705) y de la sección 2 de la ley local de agosto 15, 1933, fué suspender y dejar sin efecto las disposiciones de la ‘‘Sherman Antitrust Act’’ y de la ley local contra monopolios de marzo 14, 1907. Tal conclusión, a nuestro juicio, es errónea.

La Ley de Rehabilitación Industrial Nacional provee:

"Sec. 705.—*Los códigos, convenios y licencias estarán exentos del efecto de las leyes contra monopolios;* etc.

"Mientras esté en vigor este capítulo (o cuando de una licencia se tratare mientras la sección 704 (*a*) de este título esté en vigor) y durante los siguientes sesenta días, cualquier código, convenio o licencia aprobados, prescritos o expedidos y que estén en vigor de acuerdo con este capítulo, y cualquier acción que se haya tomado en cumplimiento de las disposiciones de la misma durante dichos períodos, estarán exentos de las disposiciones de las leyes contra monopolios de los Estados Unidos."

La ley insular de agosto 15, 1933, en su sección 2, supra, sigue el texto exacto del estatuto federal.

Debemos tener presente que la acusación original fué radicada el 19 de marzo de 1934 y que en ella se alega específicamente que los actos imputados a los acusados fueron cometidos dentro del año inmediatamente anterior a la iniciación de este procedimiento mediante la presentación de la acusación. No hay manera de determinar si los actos específicos imputados a los acusados fueron cometidos antes o después de aprobarse la Ley de Rehabilitación Industrial Nacional o la ley local de agosto 15, 1933.

No hay duda, a nuestro juicio, de que si las disposiciones antes citadas de la Ley de Rehabilitación Nacional y de la ley local pudieran interpretarse como una derogación de las leyes federal y local contra monopolios, los acusados no podrían ser procesados por cualquier conspiración o confabulación ilegal en coacción del comercio que ellos pudieran haber celebrado antes o después de la aprobación de los estatutos derogatorios. Somos del criterio de que no puede atribuirse tal efecto a la legislación que nos ocupa. Las derogaciones implícitas no deben ser favorecidas. La intención de la Asamblea Legislativa de derogar una ley "debe ser clara y evidente." *Red Rock* v. *Henry,* 106 U. S. 596, 601, 602, 27 L. Ed. 251, 253. El fin claro y manifiesto de la sección 5 de la Ley de Rehabilitación Industrial Nacional (15

U.S.C.A. sec. 705) y de la sección 2 de la ley local de agosto 15, 1933, fué eximir de las disposiciones de las leyes contra monopolios de los Estados Unidos y de Puerto Rico cualquier código, convenio o licencia aprobados, prescritos o expedidos de conformidad con las disposiciones de dichas leyes así como cualquier actuación realizada bajo dichos código, convenio o licencia, mientras dichas leyes estén en vigor y durante los sesenta días siguientes.

Que la intención del Congreso no fué derogar las leyes contra monopolios sino meramente eximir de sus disposiciones a aquellos que cumplieran con ciertas condiciones previas al disfrute de la exención, queda demostrado de manera clara y evidente por las siguientes disposiciones de la Ley de Rehabilitación Industrial Nacional (15 U.S.C.A. 705-a y 706):

"Sec. 705 *a. Limitación y exención provistas en la Sección 705.*

"La exención provista en la sección 705 se extenderá únicamente a los convenios y actuaciones realizados de conformidad con la misma (1) que contengan los requisitos de la sección 706(a), que incluyan salarios mínimos, horas máximas y la prohibición de emplear menores; y (2) que prohiban prácticas de competencia desleal contrarias a las leyes vigentes incluyendo las leyes contra monopolios, o que constituyan prácticas de competencia desleal bajo las secciones 41 a 51 de este título. (Junio 14, 1935, c. 246, sec. 2, 49 Stat. 375.)

"Sección 706.—*Radicación de las declaraciones necesarias como requisito previo a la recepción de los beneficios de la ley, reglas y reglamentos: investigaciones por la Federal Trade Commission.*

"(*a*) Ninguna asociación o grupo mercantil o industrial tendrá derecho a recibir los beneficios de las disposiciones de este capítulo hasta que radique con el Presidente una declaración que contenga la información relativa a las actividades de la asociación o grupo que el Presidente por reglamento prescriba.

"(*b*) El Presidente queda autorizado para prescribir reglas y reglamentos tendientes a garantizar que cualquier organización que se acoja a los beneficios de este capítulo represente en verdad el comercio, industria o subdivision representada por tal organización. Cualquier organización que viole tales reglas o reglamentos dejará de tener derecho a acogerse a los beneficios de este capítulo.

"(c) A instancias del Presidente la Federal Trade Commission practicará las investigaciones que sean necesarias para permitir al Presidente poner en vigor las disposiciones de este capítulo, y para tales fines la comisión tendrá todas las facultades de que está investida en relación con las investigaciones especificadas en el capítulo 2 de este título. (Junio 16, 1933, c. 90, título 1, sec. 6, 48 Stat. 198)."

La Corte Suprema de los Estados Unidos ha conocido recientemente de una situación similar en el caso de *United States* v. *Borden Company, et al.*, resuelto el 4 de diciembre, 1939, y publicado en 84 L. Ed. 143. La acusación del gran jurado en dicho caso, que alegaba una confabulación y conspiración en contravención a la sección 1 de la Ley Sherman contra monopolios, fué impugnada a través de excepciones perentorias y de mociones para anular (*motions to quash*) fundadas en que la producción y distribución de productos agrícolas, incluyendo la leche, había sido puesta fuera de las disposiciones de la Ley Sherman por la "Agricultural Marketing Agreement Act" de junio 3, 1937 (50 Stat., Part 1, Ch. 296, p. 246); y en que la Pure Milk Association, como una asociación agrícola cooperativa, y sus funcionarios y agentes, estaban exentos de ser procesados bajo la Ley Sherman, por la sección 6 de la Ley Clayton (15 U.S.C.A. sec 17). La corte de distrito resolvió en síntesis que debido al efecto de los estatutos más recientes la acusación no imputaba delito público bajo la Ley Sherman contra monopolios y en su consecuencia ordenó el archivó y sobreseimiento de la causa. La Corte Suprema en su opinión revocando la sentencia de la corte de distrito, y devolviendo el caso para ulteriores procedimientos, dijo:

"Es de notarse que la corte de distrito atribuye este efecto a la Agricultural Marketing Agreement Act por sí misma, es decir, a la forma en que opera, en ausencia y sin tomar en consideración el alcance y efecto específicos de cualesquiera convenio sobre distribución celebrados por el Secretario de Agricultura, o de cualesquiera órdenes libradas por él a tenor de la ley. A juicio de la corte inferior, la existencia de la autoridad de que el Secretario de Agricultura estaba investido—aunque éste no la ejercitara—destruía totalmente la apli-

cación y el efecto de la sección primera de la Ley Sherman en lo que a la distribución de productos agrícolas se refería.

"En nuestra opinión esta conclusión es errónea. En la Ley Agrícola no aparece semejante indicación. Si bien se le da efecto expresamente, según veremos, a convenios y órdenes que pueda celebrar y emitir el Secretario de Agricultura, no hay indicio alguno de que en su ausencia, y fuera de tal autorización limitada y de los requisitos que éstos contengan, el tráfico en productos agrícolas esté despojado de las salvaguardias fijadas por la ley contra monopolios y esté sujeto a las restricciones no importa cuán irrazonables, que productores y distribuidores en confabulación, y sus aliados, tengan por bien imponer. No nos es posible hallar que tal concesión de inmunidad por virtud de la inacción o acción limitada del Secretario ocupe sitio alguno en el plan estatutario. No podemos creer que fuera la intención del Congreso crear 'tan inmenso quebrantamiento en los remedios y sanciones históricas.'

" * * * * * * *

"La Ley Sherman es una ley amplia que prohibe restricciones irrazonables al comercio interestatal, y la monopolización o su tentativa, con sanciones penales. La Ley Agrícola es un estatuto limitado que se refiere específicamente a determinadas transacciones que pueden ser reglamentadas mediante actuación oficial en determinada forma ...

" * * * * * * *

". . . Para llevar a cabo esa política se adoptó un plan específico. A los agricultores y a otras personas no se les permite que utilicen sus propios proyectos y que celebren cualesquiera convenios o acuerdos que deseen, irrespectivamente de las restricciones que el comercio les imponga. El programa estatutario a seguirse bajo la Ley Agrícola requiere la intervención del Secretario de Agricultura, quien habrá de celebrar audiencias y dictar conclusiones. La intención obvia es disponer aquellos convenios razonables que en determinados casos y a la luz de las circunstancias reveladas, se consideren razonables. Los métodos que la Ley Agrícola permite para llegar a ese resultado son dos: convenios de distribución y órdenes. Para dar validez a los convenios de distribución el secretario debe participar en ellos . . . Que el campo cubierto por la Ley Agrícola no es el mismo que el comprendido por la Ley Sherman, se desprende de manera clara del hecho de que la primera está limitada por la actuación prescrita, de la que participa y dirige un funcionario del Gobierno que procede bajo la autoridad específicamente otorgádale por el Congreso. En lo que se refiere a acuerdos y convenios no celebrados en esa forma

ni dirigidos por el Secretario, la Ley Agrícola en manera alguna está en pugna con las prohibiciones y penalidades de la Ley Sherman, y su censura de las actuaciones privadas al entregarse a las confabulaciones y conspiraciones que impone la restricción prohibida al comercio interestatal, permanece inalterable.

"No es necesario que elaboremos este punto toda vez que la Ley Agrícola de por sí define expresamente hasta qué alcance sus disposiciones hacen inaplicables las leyes contra monopolios. Esa definición puede hallarse en la sección 5(b) de la Ley de Ajuste Agrícola, copiada en la Agricultural Marketing Agreement Act, en relación con los convenios agrícolas y dispone lo siguiente:

" 'A fin de llevar a efecto la política declarada de este capítulo, el Secretario de Agricultura tendrá facultad—luego de la debida notificación y de la oportunidad para ser oído—para celebrar convenios de distribución con agricultores, productores, asociaciones de productores y con otras personas que se dediquen a traficar con productos agrícolas, pero únicamente con respecto a aquel tráfico que esté en el curso del comercio interestatal o extranjero, o que directamente grave, obstruya o afecte el comercio interestatal o extranjero en tales productos. La celebración de semejantes convenios no se considerará que infringe ninguna ley contra monopolios de los Estados Unidos, y cualquier acuerdo de esa índole será tenido por legal: Disponiéndose, que semejante convenio no continuará en vigor una vez vencido el término de este capítulo.'

" * * * * * * *

"Estas disposiciones explícitas que exigen la intervención y autorización oficial, demuestran fuera de toda duda hasta qué punto el Congreso tuvo la intención de que la Ley Agrícola hiciera que la Ley Sherman fuera inaplicable. Si el Congreso hubiera deseado otorgar cualquier inmunidad ulterior, indudablemente el Congreso así lo hubiera dicho.

"Un convenio celebrado por el Secretario como parte, una orden dictada por él, o una decisión arbitral o un convenio por él aprobado, de conformidad con la autoridad conferídale por la Ley Agrícola y a tenor de los términos de la inmunidad descrita, serían desde luego una buena defensa a una acusación bajo la Ley Sherman, puesto que tal acusación trataría de castigar algo que se convino válidamente con el Secretario o se ordenó por éste. La Ley Agrícola no va más allá.

" * * * * * * *

"Nuestra conclusión es que la Ley de Ajuste Agrícola, según fué reenactada y enmendada por la Agricultural Marketing Agreement Act, no contiene fundamento alguno para que se interprete contra la Ley Sherman como no aplicable a las acusaciones contenidas en los cargos (counts) 1, 2 y 4."

No estamos considerando ni determinando la culpabilidad o inocencia de los acusados. Si el convenio bajo el cual los acusados procedieron a fijar, imponer y cobrar un precio uniforme arbitrario a la gasolina vendida por ellos, fué celebrado en cumplimiento de las condiciones especificadas en las secciones 704 a 706 de la Ley de Rehabilitación Industrial Nacional, de tal forma que dichos acusados puedan acogerse a los beneficios de la exención de las leyes contra monopolios, según provee la sección 705 de la referida ley, ello constituiría una defensa absoluta a los cargos que la acusación contiene. Si, por otra parte, los acusados procedieron a actuar bajo un plan y convenio común, conforme se alega en la acusación, es decir, haciendo caso omiso y no cumpliendo con las referidas condiciones previas, entonces ellos no tendrían derecho a recibir el beneficio de estar exentos de una acusación bajo las leyes contra los monopolios. Podemos decir aquí, parafraseando las palabras de la corte en el caso de *United States* v. *Needle Trade Workers' Industrial Union* (D.C.N.Y.) 10 F. Supp. 201: "Si una conspiración de la índole alegada en esta acusación ha sido aprobada en cualquiera de los códigos adoptados bajo la ley más reciente, no se ha llamado a ello nuestra atención."

Tenemos que rechazar por lo poco convincente (*unsound*) el argumento de los acusados de que el efecto legal de la mera aprobación del Código de Competencia Razonable para la Industria del Petróleo en Puerto Rico, fué perdonar, condonar y legalizar los actos cometidos por ellos con anterioridad a la aprobación de dicho código. Según la acusación los actos imputados a los acusados fueron cometidos durante el año que transcurrió entre el 19 de marzo, 1933, y el 19 de marzo, 1934. El Código de Puerto Rico fué aprobado el 27

de marzo, 1934, es decir, ocho días después de radicarse la acusación. El Código de Competencia Razonable para la Industria Petrolera fué aprobado por el Presidente el 19 de agosto, 1933, o sea, siete meses antes de presentarse la acusación original. Se han sometido para nuestra inspección copias de ambos códigos. En ellos hallamos una disposición idéntica, la sección 5 del artículo I que lee así:

"Sección 5.—Los convenios entre los competidores de la industria con el fin de llevar a cabo los objetivos de este código o cualquiera de ellos, o con el fin de eliminar duplicaciones innecesarias de facilidades fabriles, de transporte y de distribución, quedan por la presente expresamente permitidos, *pero tales convenios no tendrán efecto hasta que sean específicamente aprobados por el Presidente y se les haya dado la debida publicidad.* Semejantes convenios pueden en cualquier tiempo ser desaprobados por el Presidente y al ser así desaprobados, dejarán de tener validez.'' (Bastardillas nuestras.)

Los acusados no sostienen que el convenio, plan o combinación bajo el cual ellos procedieron a realizar los actos imputádosles en la acusación, fuera jamás aprobado por el Presidente de los Estados Unidos, tal cual exige la sección 5 de los códigos, supra. No nos sentimos autorizados para presumir la existencia de tal aprobación, especialmente en vista de la manifestación contenida en el alegato de los acusados de que ellos ''nunca han dicho que fueran directamente autorizados por el Presidente para entrar en acuerdo alguno.''

Aplicando el razonamiento de la Corte Suprema de los Estados Unidos en el caso de *United States* v. *Borden Company, supra,* al caso de autos, nos sentimos obligados a resolver que la presente acusación enmendada imputa clara y suficientemente en el lenguaje del estatuto, una infracción de las disposiciones de la sección 1 de la Ley de Puerto Rico contra monopolios de 1907; que ni la aprobación de la Ley de Rehabilitación Industrial Nacional, ni la aprobación por la Asamblea Legislativa de la Ley Núm. 2 de agosto 15, 1933, tuvieron de por sí el efecto de derogar o suspender los esta-

71

tutos federal y local contra monopolios, o cualquiera de ellos; que tanto el estatuto federal contra monopolios como el insular, han continuado en toda su fuerza y vigor después de aprobarse la legislación de emergencia, y que cualquier persona que viole las disposiciones de las leyes contra monopolios, bien antes o después de aprobarse la legislación de emergencia, está sujeta a ser procesada y castigada a menos que pueda probar que los actos que se le imputan, estaban autorizados por un código, convenio o licencia, aprobados, prescritos o expedidos en la forma provista por dicha legislación.

*Debe revocarse la resolución de la corte de distrito y devolverse el caso a dicha corte para ulteriores procedimientos de conformidad con esta opinión.*

El Juez Asociado Sr. Wolf está conforme con la sentencia y con la opinión, excepción hecha del párrafo de la misma que comienza con las palabras "No estamos considerando" y termina con la cita de 10 F. Supp. 201, por estimarlo innecesario toda vez que se refiere a cuestiones extrañas a la controversia entre las partes.