# 2006 DTA 123

## TRIBUNAL DE APELACIONES
## REGIÓN JUDICIAL DE SAN JUAN
## PANEL I

EL PUEBLO DE PUERTO RICO
Demandante-Apelado

v.

RAÚL GONZÁLEZ DÍAZ
Demandado-Apelante

Núm. KLAN-2004-00721

San Juan, Puerto Rico, a 11 de octubre de 2006

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
la Juez Feliciano Acevedo y el Juez González Vargas

González Vargas, Troadio, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

En el presente recurso, el apelante Raúl González Díaz nos solicita que revoquemos la sentencia dictada por el Tribunal de Primera Instancia, Sala de San Juan (en adelante el TPI), en el caso criminal núm. KHO1999G0010 y 0011. En el mismo se dictó un fallo de culpabilidad por los delitos de violación y sodomía (Art. 99 y Art. 103 del Código Penal de 1974, 33 LPRA, secs. 4061 y 4064). Mediante dicho dictamen, el apelante fue sentenciado a

cumplir penas concurrentes de 15 y 10 años de cárcel respectivamente.

# I

El apelante fue imputado y arrestado por los delitos de violación, sodomía, proxenetismo y dos cargos por actos lascivos. Se le imputó haber incurrido en tales delitos en contra de la joven Vanessa Torres Monarca, la que se alegaba era incapacitada mental para la fecha de los hechos. Se celebró la vista preliminar, en la cual el TPI determinó no causa, a base de una identificación espontánea que hizo la víctima de una persona distinta al entonces imputado, Raúl González Díaz. Posteriormente, el Ministerio Público solicitó vista preliminar en alzada y en esta ocasión el tribunal determinó causa probable para acusar al apelante. Durante el mes de abril de 1999, el Ministerio Fiscal formuló acusaciones contra el apelante por los delitos de violación y sodomía. Se le imputó sostener relaciones sexuales y contranatura con la joven incapacitada, así como proxenetismo y dos cargos por actos lascivos.

La defensa solicitó la desestimación de las acusaciones al amparo de la Regla 64 (a) y (p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 64. Apoyó su pedido en cuestionamientos a la suficiencia de la prueba, la identificación errónea del autor de los hechos, capacidad de la víctima para consentir e invalidez del allanamiento, entre otras alegaciones. A base de los fundamentos aducidos por la defensa, el TPI desestimó los dos cargos por actos lascivos. Además, anuló dos órdenes de allanamiento y suprimió la evidencia incautada en esa intervención llevada a cabo en la residencia del acusado, basándose en que las órdenes fueron expedidas en fecha remota, habiendo transcurrido más de tres meses desde que ocurrieron los hechos. No obstante, denegó la supresión de manifestaciones incriminatorias hechas por el apelante mientras se diligenció la orden de arresto y allanamiento de su residencia.

Inconforme con la resolución emitida, el apelante recurrió a este Tribunal mediante petición de *certiorari* ▪ y presentó una moción de auxilio de jurisdicción para paralizar los procedimientos, la cual fue acogida. Posteriormente, este Tribunal confirmó la resolución emitida por el TPI, aunque modificó la misma a los efectos de desestimar el cargo por proxenetismo, debido a que no se demostró que el apelante tuviera ánimo de lucro al sostener la relación sexual con la víctima o que quisiera satisfacer la lasciva ajena. En cuanto a la identificación, este Tribunal sostuvo que el error de la perjudicada al identificar a otras personas como los responsables de los hechos, no viciaba ese proceso, puesto que había presentado prueba independiente que permitía al Foro de Instancia hacer la determinación de causa probable. Asimismo, se validó la admisibilidad de las manifestaciones incriminatorias al llevarse a cabo el arresto.

El TPI celebró el juicio en el que se presentó prueba testifical, documental y pericial. La prueba presentada por el Ministerio Público consistió del testimonio de la víctima y de los siguientes testigos: Adela Cruz Correa, Gloria Díaz Contreras, María Teresa González Torres, Carlos Sánchez Ramos, Ángel L. Cotto Martí, Jesús Pereiro Más, Jorge Santos Cintrón, Daruny Maldonado Torres y el fiscal Román Muñiz Santiago. También presentó al Dr. Francisco J. Umpierre Vela como perito. La defensa presentó como testigos a la Dra. María Luisa Román Orta, Victoria Rosario de los Santos (abuela de la víctima), Alba Martínez Rodríguez, así como a su perito, la Dra. Arlene Rivera Mass.

Oportunamente, el apelante presentó una moción en la que solicitó la desestimación de la acusación por violación, a la luz de la Regla 64 de Procedimiento Criminal, *supra,* aduciendo que la acusación no imputaba adecuadamente el delito, al omitir alegar que la víctima no era su cónyuge. El Ministerio Público presentó moción en oposición y el 4 de marzo de 2004, el TPI emitió una Resolución declarando sin lugar la desestimación de la acusación. El apelante solicitó reconsideración, la cual también fue denegada.

El jurado rindió un veredicto de culpabilidad en ambos cargos y el 25 de mayo de 2004, el TPI dictó sentencia imponiendo al apelante penas de 15 y 10 años de cárcel, a ser cumplidas de manera concurrente.

Inconforme con dicha sentencia, el 22 de junio de 2004, el apelante interpuso el presente recurso de apelación. En esa misma fecha, presentó ante el TPI una moción solicitando fianza en apelación al amparo de la Regla 198 de Procedimiento Criminal, 34 L.P.R.A Ap. II, R. 198. El Ministerio Público se opuso a ese pedido. Luego de celebrada una vista, a petición del apelante, el TPI emitió una Resolución declarando no ha lugar la solicitud. ▓

Inconforme con lo resuelto por el TPI, el apelante comparece ante nos y plantea que el tribunal sentenciador incurrió en la comisión de los siguientes errores:

*"Primer Error: El proceso de identificación del acusado-apelante como el autor de los hechos imputados estuvo plagado de tantos errores, que termino (sic) privando al acusado-apelante de un juicio justo e imparcial y del debido proceso de ley.*

*Segundo Error: Erró el Honorable Tribunal de Instancia al permitir que se presentase ante el Jurado la opinión del Psicólogo Francisco José Umpierre, sobre la capacidad mental de la alegada perjudicada, cuando el propio testimonio de ese testigo durante la vista en virtud de la Regla 9 de Evidencia surgía que su opinión no era confiable, ya que no se controlaron múltiples variables que podían alterar el resultado de las evaluaciones realizadas a la alegada perjudicada.*

*Tercer Error: El testimonio del testigo de cargo, psicólogo Francisco Umpierre, junto al testimonio de la doctora María Román Orta, lejos de esclarecer fuera de duda razonable, que el día de los hechos que se le imputan al acusado-apelante, la alegada perjudicada estuviese incapacitada para consentir válidamente a una relación sexual, o para conocer la naturaleza de una relación sexual en el momento de realizarla, tendió a establecer que probablemente sí estaba capacitada para consentirla.*

*Cuarto Error: Erró el Honorable Tribunal de Instancia al negarse a resolver que la Ley 141 de 14 de diciembre de 1997, al viabilizar la posibilidad de un matrimonio entre personas con retardación mental leve o moderada, implícitamente reconoce en los retardados en esas categorías la capacidad para consentir a una relación sexual.*

*Quinto Error: Erró el Honorable Tribunal de Instancia al aplicar mecánicamente la Regla 21 de Evidencia, que en principio excluye la evidencia sobre conducta sexual previa de la alegada víctima como medio para atacar su credibilidad, cuando en realidad la Defensa intentaba presentar esa evidencia como medio para establecer que sí tenía capacidad para consentir a una relación sexual, y que conocía la naturaleza de ese acto al momento de realizarlo.*

*Sexto Error: Erró el Honorable Tribunal de Instancia al denegar la solicitud de la Defensa de que se disolviese el jurado, al quedar demostrado que aunque la joven Vanessa Torres Monarca dependía de una serie de medicamentos para funcionar establemente, no sólo no existía evidencia de que estuviese siendo medicada correctamente mientras se ha encontrado bajo la custodia del Estado, sino que por el contrario la evidencia demostraba que muchas de las alteraciones y variaciones en su funcionamiento durante el proceso se debían a que estaba siendo medicada erróneamente. Al no garantizarle una adecuada medicación de la alegada perjudicada durante todas las etapas del proceso, se violó al acusado su derecho a un juicio justo e imparcial y el debido proceso de ley.*

*Séptimo Error: Erró el Honorable Tribunal al permitir al Ministerio Público presentar el testimonio del fiscal Román Muñiz Santiago, sobre unas alegadas expresiones del acusado apelante al momento de ser arrestado, que no fueron entregadas a la Defensa oportunamente, a pesar de que le fuesen solicitadas oportunamente en virtud de una Moción bajo la Regla 95 de Procedimiento Criminal, y a pesar de que el Ministerio Público tenía conocimiento de que estaban a su disposición, procediendo a informárselas a último*

531

*momento, cuando ya había concluido el descubrimiento de prueba y había comenzado el proceso, privando al acusado-apelante de esa crucial información hasta luego de concluida la etapa de preparación para juicio, de haberse delimitado la estrategia de Defensa, y de haberse tomado decisiones fundamentales como las de entrar a juicio por jurado.*

*Octavo Error: Erró el Tribunal de Instancia al negarse a dejar sin efecto el veredicto de culpabilidad por un delito de sodomía básica, (sin que hubiese declarado probada ninguna de las circunstancias agravantes), a pesar de que (1) el delito de sodomía básica resulta inconstitucional a la luz de lo resuelto en el caso de Lawrence vs. Texas, 123 S.Ct. 2472 (2003); (2) el delito de sodomía básica resulta inconstitucional por vaquedad (sic)."*

Además, habiéndose derogado el delito de sodomía básica, el acusado-apelante tiene derecho a que se deje sin efecto esa sentencia.

*"Noveno Error: Erró el Honorable Tribunal de Instancia al declarar Sin Lugar la Moción de Desestimación de la acusación por el delito de violación (art. 99), en virtud de la Regla 64(a) de las de Procedimiento Criminal, por razón de que la misma no imputaba adecuadamente un delito, ya que no alegaba que la supuesta perjudicada no era la cónyuge del acusado, en contravención de lo resuelto en los casos de Pueblo v. Cortés, 24 D.P.R. 208 (1916); Pueblo v. Martínez, 24 D.P.R. 224; Pueblo v. Avilés, 54 D.P.R. 272; Pueblo v. Torres, 56 D.P.R. 61; Pueblo v. García, 78 D.P.R. 88, y Pueblo v. Pérez Rivera, 129 D.P.R. 306 (1991)."*

Luego de ciertos trámites procesales, el apelante cambió su representación legal. Por medio de sus nuevos abogados presentó un *Escrito en Réplica a Alegato del Pueblo de Puerto Rico*. En el escrito aduce que fue inadecuada la acusación al no incluir el elemento de que la víctima no era la cónyuge del acusado; que el delito de sodomía era inaplicable a base del principio de favorabilidad; hace alusión a lo sucedido en la vista preliminar y alega que la prueba presentada en su contra fue fabricada; cuestiona la identificación del apelante por entender que fue insuficiente; cuestiona la capacidad mental de la víctima; alega que el apelante procedió a base de un error sobre la capacidad mental de la víctima para consentir a tener relaciones sexuales; intenta discutir nuevamente planteamientos que ya fueron adjudicados por este foro en el caso KLCE-03-01302, del cual se recurrió mediante recurso de *certiorari* ante el Tribunal Supremo, cuya expedición fue denegada.

El 7 de junio de 2006, el apelante presentó ante nos un *Escrito Complementario a Escritos Anteriores Planteando Errores Perjudiciales Sustanciales*. En el mencionado escrito se plantean 17 nuevos errores que, en su mayoría, atacan la apreciación de la prueba hecha por el jurado. Invocan un caso reciente, de fecha posterior a los hechos del caso, para impugnar la determinación de causa probable; señalan algunos errores relativos a incidentes procesales que debieron objetarse ante el TPI; y cuestionan la negativa de admitir evidencia del historial sexual de la víctima, así como su capacidad mental y el valor probatorio de los peritos.

En esa misma fecha, el apelante presentó una *Moción incluyendo moción sobre nuevos errores adicionales impugnando las sentencias dictadas y para que se acepten y discutan como parte del recurso de apelación dictado*. El Procurador General compareció oponiéndose a que se permitan los nuevos errores señalados.

Sobre estos últimos escritos debemos aclarar que, aun cuando coincidimos con el apelante en lo referente a nuestra obligación de escudriñar y buscar la verdad más allá de los errores planteados, concurrimos con el Procurador General en cuanto a que nuestro ordenamiento provee un término jurisdiccional de 30 días ▮ para la presentación de una apelación con sus respectivos señalamientos de errores y luego la presentación de los alegatos de las partes. Si bien estamos conscientes del *"hecho de que dichos letrados no fueron los mismos que intervinieron como representantes legales del apelante en las etapas del procedimiento ventiladas ante el TPI"*, no es prudente permitir que un apelante, con la justificación de que ha cambiado de representación legal, continúe señalando errores en una apelación luego de presentados los alegatos de las partes. Abrir esa puerta traería consigo apelaciones interminables, así como cambios innecesarios de representación legal como llave para abrir

esa puerta y continuar levantando nuevos errores y con ello nuevos alegatos. El derecho al debido proceso de ley no tiene tal alcance, sobre todo en la presente etapa apelativa. Además, de ninguna manera podemos catalogar el trabajo de los anteriores abogados como deficiente al extremo que justifique una medida como la solicitada. Por el contrario, la representación legal fue altamente competente y efectiva.

Por otro lado, adviértase que la solicitud de la parte apelante para que se le autorizara levantar nuevos señalamientos de error fue declarada no ha lugar por este Tribunal mediante Resolución del 21 de diciembre de 2005. No obstante, se le autorizó replicar al alegato presentado por la Oficina de Procurador General. De ahí que la presentación del escrito con nuevos señalamientos de error constituyó un acto contrario a lo expresamente determinado por este Foro.

Aún así, movidos por nuestra suprema vocación de hacer justicia y buscar la verdad, hemos examinado los referidos señalamientos y encontramos que ninguno de ellos contiene méritos de tal envergadura que nos mueva a variar el dictamen notificado en la presente Sentencia. Asimismo, notamos que muchos de los errores recientemente planteados por el apelante están relacionados con los que se discuten a continuación, o fueron objeto de seria consideración y adjudicación por este Foro en el recurso anteriormente citado, particularmente los relacionados con el procedimiento de la vista preliminar. Por estas razones adicionales, resulta innecesario discutirlos por separado.

Luego de examinar los alegatos del apelante y del Procurador General y de evaluar minuciosamente la transcripción de la prueba oral sometida, estamos en condición de resolver los asuntos planteados.

## II

### A. Prueba de Cargo presentada ante el TPI.

Como ya señalamos, la prueba de cargo contra el apelante consistió de los testimonios de la víctima y de los siguientes testigos: Adela Cruz Correa, Gloria Díaz Contreras, María Teresa González Torres, Carlos Sánchez Ramos, Ángel L. Cotto Martí, Jesús Pereiro Más, Jorge Santos Cintrón, Daruny Maldonado Torres y el fiscal Román Muñiz Santiago. También, presentó al Dr. Francisco Umpierre Vela como perito. A fin de tener una mejor comprensión de la prueba de cargo, la resumimos en los siguientes términos.

Vanessa Torres Monarca para el año 1997, tenía 21 años de edad y se alegaba que era mentalmente incapacitada. Para esta fecha se encontraba recluida en el Centro de Servicios Integrales para Adultos con Retardación Mental, ubicado en aquel momento en el Barrio Caimito de San Juan. El sábado 13 de septiembre de 1997, Xiomara Monarca, madre de Vanessa, solicitó llevarse a su hija de pase por unas horas, lo cual fue debidamente autorizado. Al mediodía, la señora Monarca pasó a recoger a su hija, según acordado. Se personó a la Institución en un vehículo blanco, marca Lexus, tablilla BGK-713, conducido por el apelante. Éstos, luego de identificarse con el guardia de seguridad ubicado en la entrada del Centro y de proveerles la información requerida, pasaron con el vehículo a recoger a Vanessa. Salieron con ésta y se dirigieron al Motel OK donde alquilaron una habitación. En ese lugar, el apelante sostuvo relaciones sexuales, tanto vaginales como anales con Vanessa. Poco después de las tres de la tarde, la señora Monarca y el apelante llevaron a Vanessa de regreso al Centro. Aunque no entraron con el vehículo a la Institución, dejaron a Vanessa en la entrada peatonal de este lugar.

Al día siguiente, ésta relató a la señora Adela Cruz Correa, enfermera práctica del Centro donde Vanessa estaba recluida, lo que había sucedido en el motel. Los hechos fueron notificados a la Policía y luego de la investigación correspondiente, se identificó al apelante como el autor de los hechos.

Con el beneficio de la transcripción de la prueba sometida, procedemos a resumir los aspectos más relevantes del testimonio de los testigos de cargo.

La señora Adela Cruz Correa, enfermera práctica del Centro donde estaba recluida la víctima, declaró que ésta tenía que ser supervisada constantemente, incluso en cuanto a su aseo personal. ■ Aclaró que el 14 de septiembre de 1997, Vanessa estaba nerviosa, que insistió que la testigo la escuchara. ■ Sostuvo que Vanessa le relató lo sucedido el día anterior. ■ Dicha información fue referida a la directora interina y a la trabajadora social del Centro. Es importante enfatizar que Vanessa expresó que su madre le advirtió que no dijera nada sobre lo sucedido. ■

En el contrainterrogatorio se confrontó a la testigo con una declaración jurada que prestó el 1 de octubre de 1997, en la cual describió a Vanessa como una niña muy capacitada. No obstante, aclaró en el re-directo que se refería a Vanessa como una niña, porque tenía la capacidad de un niño de ocho años. ■ Más adelante declaró que Vanessa seguía instrucciones y no olvidaba las cosas.

La señora Gloria Díaz Contreras, Directora Interina del Centro, declaró que en las mañanas Vanessa se aseaba supervisada por una asistente terapéutico. Aclaró que Vanessa no podía realizar ninguna de las actividades sin supervisión, puesto que no las realizaba o las dejaba a mitad. Atestó que Vanessa le comunicó lo ocurrido el 13 de septiembre de 1997, relato que es consistente con el que hizo a la señora Cruz. ■

En cuanto a otros detalles, la testigo declaró, entre otras cosas, que Vanessa le había dicho que el lugar al cual su mamá y su acompañante la llevaron era cerquita del Centro; que tenía luces de colores que daban vueltas en el techo y que tenía un radio grande. Añadió que la bañera era roja y que el hotel era rosa y que tenía árboles alrededor de la entrada. También indicó que su mamá tenía un *"polvito blanco"*, que ella y Juan ■ se lo pusieron en la nariz, pero que ella no lo hizo; y que fumaron cigarrillos y bebieron Budweiser.

La testigo narró, además, que una vez notificaron a la policía de lo ocurrido, acompañó a los agentes investigadores, conjuntamente con Vanessa y una empleada del Centro a identificar el Motel en el que habían ocurrido los hechos. Señaló que salieron a la carretera y se dirigieron hacia Caguas, pasando por varios moteles que habían en esa área; que al pasar por la entrada del Motel Ok Vanessa les dijo que había sido en ese lugar; que entraron y la perjudicada señaló un cuarto de los que había en esas facilidades: *"Sí, ahí, ahí"*. T.E., 29 de septiembre de 2003, pág. 30. La testigo continuó declarando que el Motel Ok tenía una entrada con árboles a los lados y al final estaba el motel y era rosa; y que las puertas de entrar el vehículo era como había dicho Vanessa ubicadas en la entrada de los cuartos de las que suben y bajan.

En cuanto a las actividades que Vanessa hacía diariamente, la testigo indicó que en la mañana se le daba el aseo personal, y una asistente terapéutico supervisaba que se bañara, que se lavara la cabeza y la boca, que se secara, que se vistiera y que fuera a desayunar. Luego las personas del equipo clínico la buscaban en la sala y le deban terapia recreativa y terapias pasivas como ver televisión, hacer caminatas y jugar. Finalmente declaró que Vanessa necesitaba supervisión para todas sus actividades.

La señora María Teresa González Torres, enfermera práctica del Centro, señaló que a Vanessa había que acompañarla, porque ella necesitaba asistencia todo el tiempo, ya que no podía hacer las cosas por sí misma y tenían que orientarla siempre en todas las tareas del diario vivir. Así ocurría en cuanto a su aseo personal, cómo vestirse y preparar la cama. Aclaró que si Vanessa no tenía supervisión, no hacía las cosas o las hacía mal. Continuó declarando que la madre de Vanessa, Xiomara Monarca, le solicitó un *"pase"* para llevarla por unas horas a almorzar. ■

El señor Carlos Sánchez Ramos, Agente de la policía, sostuvo que fue quien investigó el caso junto a la Agente Daruny Maldonado. Relató el procedimiento llevado a cabo durante la investigación. Señaló que acompañó a la víctima en un recorrido por los moteles más cercanos al Centro y luego de descartar el primer motel que coincidía con la descripción dada por Vanessa, llegaron al Motel OK. La descripción de dicho local era cónsona con la que dio la víctima. Continuó relatando que al entrar al lugar, la víctima indicó inmediatamente y

en más de una ocasión que ése era el lugar donde ocurrieron los hechos. ■

Por su parte, el señor Ángel L. Cotto Martí, técnico de escena ■ del CIC de San Juan, testificó que, a solicitud de la agente Daruny Maldonado, tomó fotografías del Motel OK, desde su entrada y de la cabaña 57. ■ Las fotografías tomadas fueron identificadas en sala.

El señor Jesús Pereiro Más, guardia de seguridad, testificó con respecto a las labores que rindió en el Centro. Relató que llevaba un récord de los vehículos que entraban a la Institución, anotando la marca del vehículo, la tablilla y el nombre de la persona que lo conducía. ■ Continuó testificando que el 13 de septiembre de 1997, Xiomara Monarca se personó al lugar acompañada por un señor que se identificó como Juan, quien conducía un vehículo, el cual anotó en su récord. Según surge del expediente, el vehículo era uno marca Lexus, color blanco, tablilla BGK-713. ■ Identificó, además, al acusado como la persona que conducía ese vehículo, ■ al cual tuvo ocasión de observar cuando éste se bajó del mismo mientras esperaba por la Sra. Monarca y su hija.

El señor Jorge Santos Cintrón, empleado del Motel, declaró que para la fecha de los hechos, se encargaba de cobrar a los clientes que llegaban a ese lugar y anotar el número de tablilla de los vehículos que entraban. Este proceso se daba a través de un orificio pequeño en la entrada de las cabañas por donde éste anotaba el número de tablilla del vehículo y le cobraba al cliente de acuerdo con la cabaña escogida. ■ La información se anotaba en una tarjeta azul, la cual fue admitida en evidencia. Testificó que el día de los hechos anotó en la tarjeta azul que la cabaña 57 fue utilizada por un Lexus blanco, tablilla BGK-713, desde las 12:10 p.m. hasta las 3:08 p.m. ■ El testigo describió la cabaña fotografiada, cuya descripción concuerda con la ofrecida por Vanessa, ■ particularmente con respecto a las luces de colores, los cristales, la bañera en forma de corazón y el cuadro de una dama con una pantera.

La señora Daruny Maldonado Torres declaró que estuvo a cargo de la investigación del caso. Aclaró que la señora Díaz es quien hizo la querella como directora del Centro. Relató el proceso de la investigación y confirmó la identificación hecha por la víctima del Motel OK como el lugar de los hechos. En su declaración corroboró lo atestado por Vanessa sobre lo ocurrido en ese lugar. Sostuvo que Vanessa le expresó que salió del Centro con su mamá y un amigo de ésta, quien sostuvo relaciones sexuales con ella por la vía vaginal y anal, ■ y describió al amigo de su mamá como bajito y con ojos verdes. ■ Testificó sobre la investigación realizada para identificar al dueño del vehículo Lexus blanco, tablilla BGK-713, y explicó que se determinó que se trataba de un *"leasing"* que estaba a nombre de un bufete de abogados. Luego de seguir a ese vehículo por varios días, llegaron a la conclusión de que el vehículo era habitualmente conducido por el apelante. ■

Sostuvo además que, luego de obtener la correspondiente orden de arresto y allanamiento, se personaron a la residencia del apelante, donde procedieron a arrestarlo y luego de impartidas las advertencias correspondientes, el acusado exclamó: *"Manché el nombre de mi hijo y su carrera".* ■

El señor Román Muñiz Santiago fue el fiscal que acompañó a la agente Maldonado a diligenciar la orden de arresto contra el apelante. Confirmó las expresiones del apelante al momento de su arresto, al exclamar: *"¡Dios mio, qué yo he hecho! He manchado el nombre de mi hijo y de su carrera."* ■ Además, testificó que el acusado *"[m]anifestó de que sí, ese día él había estado en el Centro, refiriéndose a donde estaba la joven, pero que fue ahí con la mamá de la joven, una señora de nombre Xiomara Monarca."* ■

El Dr. Francisco J. Umpierre Vela fue aceptado como perito de cargo, luego de testificar sobre sus conocimientos como psicólogo, y su experiencia de 24 años trabajando con pacientes mentalmente incapacitados. Éste llevó a cabo exámenes con el propósito de establecer la capacidad intelectual de Vanessa. ■ Al administrarle el examen de Escala de Inteligencia *"Weschler"* para Adultos (EIWA), equivalente al IQ o coeficiente intelectual, determinó que la retardación mental de la paciente era leve. ■ Sin embargo, determinó

que Vanessa tenía serias dificultades para leer, pues ni siquiera pudo leer un reloj digital.

Continuó relatando que le administró el *"Test of Nonverbal Intelligence"* (TONI), prueba que consiste en determinar la inteligencia no verbal de la paciente. El resultado que arrojó ese examen fue de 57 de coeficiente, representando menos de punto dos por ciento de la población. ■ En cuanto al juicio social de la paciente, aspecto que mide la capacidad para entender lo que debe o no hacer en ciertas circunstancias, Vanessa tenía un retardo mental moderado. Encontró además que la capacidad funcional de la víctima era bien pobre. ■ Testificó que la capacidad de Vanessa para decidir, conocer las consecuencias de sus acciones, prever, mirar hacia un futuro o responder correctamente al respecto, eran las áreas en las que tenía un retardo mental moderado. ■ En cuanto a la opinión del perito sobre si Vanessa podía consentir valida o inteligentemente a una relación sexual, el perito opinó que, a base del cuadro clínico y de la evaluación que le había realizado en los días en que evaluó a Vanessa, (7 de noviembre y 30 de diciembre de 2003), entendía que ella no podía tomar una decisión al respecto. ■ El perito basó su opinión en tres factores: en el retardo leve, en el problema emocional y en los aspectos físicos de salud. ■ Señaló además, que el patrón de conducta de ella era bien inestable, que era el de una niñita de unos cinco a seis años de edad, que se antojaba de los juguetes que había en su oficina y actuaba como una niñita pequeña. ■

La joven Vanessa Torres testificó en el juicio. A preguntas del Ministerio Público, reconoció que el propósito de su presencia en el tribunal estaba relacionado con lo que le hizo, quien ella identificó como *"el viejo"*, ■ refiriéndose al apelante. Posteriormente, relató que éste la había violado, insistiendo en que la había penetrado, haciendo gestos indicando sus partes privadas. ■ Continuó explicando que el apelante la llevó a un lugar grande y rosita en el carro de éste, ■ y describió el interior del lugar al señalar que contenía una bañera grande de corazón y un cuadro de una mujer y un tigre. ■ Incluso expresó que la palabra *"violar"* la había aprendido del apelante, quien le dio instrucciones de no decir esa palabra. ■ El testimonio de la víctima se puede describir como impredecible y espontáneo. Fue además, sustancialmente consistente con el relato que hizo a los demás testigos sobre lo sucedido el 13 de septiembre de 1997.

## B. Prueba de Defensa presentada ante el TPI.

La prueba de la defensa del apelante consistió de los testimonios de la Dra. María Luisa Román Orta, Victoria Rosario de los Santos (abuela de la víctima), Alba Martínez Rodríguez, así como su perito, la Dra. Arlene Rivera Mass.

La Doctora María Román Orta, psiquiatra aceptada como perito por el TPI, testificó en cuanto a lo que le manifestó Vanessa sobre el día de los hechos, cuyo relato fue consistente con los anteriores: que salió con su madre y un amigo, la llevaron a un motel y el amigo de su madre la violó. ■ Luego de evaluar a Vanessa, la Doctora Román calificó el juicio social de Vanessa como sumamente limitado y que no podía asumir responsabilidad por sus actos. ■

En cuanto a la capacidad para consentir al acto sexual, la Doctora Román testificó lo siguiente"

*"P. Bien. Esa persona, ¿sería . . . estaría capacitada para consentir al acto sexual?*

*R. Dentro del grado de limitación de la paciente, no le puedo contestar la pregunta porque en ese momento dado, que ella está así en . . . está en el ambiente en que se encuentra, . . .*

*P. Sí.*

*R. . . .ella pudo haber cam. . . ella puede estar en ese momento dado, su cuerpo, su libido aumentado, su apetito sexual aumentado, en ese momento dado. Y este tipo de paciente por su historial ya pasado, previo, pues, no*

*tiene juicio ante la toma de decisión de una acto sexual porque estos pacientes no tienen su juicio adecuado cuando van a hacer el acto sexual, porque estos pacientes son bien hipersexuales y esa contestación, pues, entiendo de (sic) que su juicio en ese momento dado no está capacitado para consentir. Porque eso es como cuando un nene chiquito. . .*

*P. ¿No está capacitado para consentir?*

*R. Exacto. Cuando un nene chiquito quiere un dulce, ¿cómo lo puedo decir?, por más que se le niegue el dulce, sabe, quiere ese dulce, aunque le haga daño, lo quiere."* ■

Por su parte, la Doctora Arlene Rivera Mass, luego de aceptada como perito por el TPI, testificó que, aunque sólo tuvo contacto con Vanessa por espacio de una hora, la capacidad para consentir se presume si la persona entiende lo que está haciendo y opinó que Vanessa entendía lo que era un acto sexual y las consecuencias del acto. ■ De igual forma, la perito indicó que no creía que Vanessa hubiese realizado el acto sexual meramente porque alguien se lo ordenara. ■ Sostuvo que Vanessa tenía capacidad para tramar o *"confabular".* ■ Aún así, testificó que en la reunión que sostuvo con Vanessa el 26 de febrero de 2003, ésta no reconocía dónde se encontraba, ni sabía la fecha, la hora o el día y tampoco pudo decir cuál era su fecha de nacimiento. Asimismo, resumió el testimonio de la víctima sobre lo sucedido. ■ Al preguntarle datos sobre su pasado, Vanessa no pudo precisar cuál era su edad. ■ La Doctora Rivera en varias ocasiones reiteró su opinión de que Vanessa tenía capacidad para consentir, a pesar de que sólo la entrevistó por espacio de una hora. ■

Por último, la abuela de la víctima, Victoria Rosario de los Santos, luego de limitado su testimonio, declaró esencialmente que a su nieta le gustaba vestir muy provocativa y *"fiestar".* ■ Además atestó que Vanessa se comportaba como una niña, aunque era una mujer. ■

## III
## A. Primer señalamiento de error: procedimiento de identificación del apelante.

El apelante plantea que el proceso de identificación estuvo plagado de errores. No se llevó a cabo trámite extrajudicial alguno de identificación, como la rueda de detenidos o mediante fotografías. Señala además, que en la vista preliminar identificó como el autor de los hechos a uno de los abogados, que en la vista en alzada identificó a otro abogado y en el juicio lo confundió con uno de los miembros del jurado. ■

Es de profundo arraigo jurídico que la identificación correcta, certera y confiable del acusado es una etapa o fase esencial en el procedimiento criminal. *Pueblo v. Mejías,* **2003 J.T.S. 126**; *Pueblo v. Gómez Incera,* 97 D.P. R. 249 (1969). No puede subsistir una convicción sin prueba que señale e identifique al imputado como la persona que cometió los hechos delictivos. En su obra *Derecho Procesal Penal,* la profesora y tratadista Olga E. Resumil, señala que *"[l]a identificación de sospechosos o acusados constituye el eslabón indispensable para conectar al acusado con la comisión de un delito en calidad de autor responsable".* O. Resumil, *Derecho Procesal Penal,* New Hampshire, Equito Publishing Co., 1990, pág. 326.

Como parte de la fase investigativa de un caso criminal, el Estado puede valerse de varias formas para identificar los sospechosos de la comisión del delito investigado. Entre las diversas formas de investigación disponibles se encuentra la rueda de detenidos, fotografías y las huellas dactilares. *Pueblo v. Ramos y Álvarez,* 122 D.P.R. 287, 310 (1988).

La Regla 252 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 252, dispone los procedimientos para la identificación mediante rueda de detenidos y fotografías. La mencionada Regla persigue especialmente evitar que los funcionarios del Estado a cargo de un procedimiento de identificación interfieran indebidamente con los

testigos, sugiriéndoles la persona que deben identificar. *Pueblo v. Mejías, supra; Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302 (1987).

En aquellos casos en los que la víctima o el testigo de la comisión de un delito no conozcan personalmente al sospechoso, o no existan otras alternativas confiables para la correcta identificación del autor de los hechos, el procedimiento más aconsejable es la identificación mediante una rueda de detenidos. Sin embargo, el hecho de que no se celebre tal procedimiento, no tiene el efecto automático de viciar o hacer inadmisible la identificación. *Pueblo v. Mejías, supra; Pueblo v. Robledo*, 127 D.P.R. 964 (1991). No se trata de un proceso mandatario para todos los casos criminales. Nuestra jurisprudencia ha resuelto que los mecanismos allí dispuestos son "*instrumento[s] en reserva para usarse cuando la confusión, el correr del tiempo, el recuerdo tenue, la inseguridad del testigo, o cualquier otro factor en la evaluación lógica enerve la razonable certeza exigida de quien señala al autor del delito*". O. Resumil, *ob. cit.*, pág. 333.

De otra parte, como bien señala el profesor Chiesa, "*[e]l elemento de si era necesario celebrar una rueda que no se efectuó afectará más el valor probatorio que la admisibilidad de la prueba de identificación en el juicio.*" Ernesto L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Vol. I, Colombia, Forum, 1991, pág. 222.

Por otro lado, conviene señalar que es suficiente la evidencia directa de un testigo que le merezca al juzgador entero crédito para probar cualquier hecho, incluyendo la identificación del sospechoso, salvo que por ley se disponga otra cosa. Regla 10 (D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10. La conclusión del juzgador de hechos sobre la confiabilidad de la prueba de identificación de un acusado "*tiene todo el respeto y validez que ordinariamente se extiende a las determinaciones de hechos*". *Pueblo v. Mejías, supra; Pueblo v. Ortiz Pérez*, 123 D.P.R. 216 (1989), págs. 223-224.

Es, además, norma avalada por el Tribunal Supremo que; "*aunque ésta [la identificación] sostenga elementos de sugestividad, no viola el debido proceso de ley si están presentes suficientes elementos de confiabilidad, tomando en consideración la totalidad de las circunstancias*". *Pueblo v. Ortiz Pérez, supra;* Dora Nevares-Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño 32*, 5ta ed., Instituto para el Desarrollo del Derecho, Inc. (1998). Lo importante no es el método utilizado para la identificación del acusado, sino que la identificación haya sido libre, espontánea y confiable. El Tribunal Supremo ha reiterado que: "*[c]uando de la totalidad de las circunstancias surja que la identificación tiene suficientes garantías de confiabilidad, ésta debe admitirse*". *Pueblo v. Mejías, supra; Pueblo v. Torres Rivera*, 137 D.P.R. 630 (1994); *Pueblo v. Ramos y Álvarez, supra; Pueblo v. Rosso Vázquez*, 105 D.P.R. 905 (1977).

La transcripción de la prueba en el presente caso demuestra que para establecer la identificación del apelante, el Ministerio Fiscal en ocasiones recurrió a la presentación de evidencia circunstancial. Conforme a la Regla 10 (H) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(H), cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia indirecta o circunstancial. La evidencia circunstancial o indirecta es aquélla que tiende a demostrar el hecho en controversia probando otro distinto del cual, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia o hacerse una determinación conclusiva de los hechos probados del caso. *Chévere v. Levis II*, 152 D.P.R. 492 (2000); *Colón González v. Tienda Kmart*, 154 D.P.R. 510 (2001).

La evidencia circunstancial es intrínsicamente igual a la evidencia directa. *Pueblo v. Pagán Santiago*, 130 D.P.R. 470 (1992); *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139 (1985); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980); *Pueblo v. Salgado Velásquez*, 93 D.P.R. 380 (1966). La norma de derecho en relación con este tipo de evidencia es que puede darse por probado un hecho a base de una inferencia, cuando hay una relación racional entre ésta y el hecho básico probado. *Chévere v. Levis II, supra.* Nuestro más Alto Foro ha identificado 3 tipos de evidencia circunstancial que pueden tener el efecto de vincular al acusado con el

delito: (i) hechos anteriores al crimen y que apuntan hacia su futura comisión; (ii) hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado; o (iii) hechos posteriores al crimen que sugieren que el acusado lo cometió. *Pueblo v. Ortiz Rodríguez,* 100 D.P.R. 972 (1972).

En lo que respecta a este caso, la prueba presentada por el Ministerio Público, independiente de la identificación en sala efectuada por la víctima, fue suficiente en derecho para identificar al apelante como el autor de los hechos. **Dicha prueba fue además aquilatada y creída por el jurado.** Aunque la identificación en sala del acusado por la víctima fue errónea y contradictoria, esa no fue la única evidencia presentada para identificar al acusado como el autor de los hechos. El jurado contó con el testimonio del guardia de seguridad del Centro sobre la sólida identificación del vehículo utilizado para perpetrar los hechos. Contó, además, con la identificación del apelante por parte de este testigo en el juicio. A pesar de los cuestionamientos de la defensa a su testimonio por no haberlo identificado en la vista preliminar, éste se reafirmó en la corrección de su identificación, en vista de que tuvo la oportunidad de observar al acusado cuando se bajó del vehículo mientras esperaba por sus acompañantes.

Asimismo, la información de los registros del Motel coinciden perfectamente con el tiempo de la salida y el regreso de Vanessa al Centro. También coincide el número de tablilla registrado en el Motel con el del vehículo que recogió a Vanessa en la Institución el mismo día de los hechos. Además, de la investigación llevada a cabo por los agentes que testificaron en el juicio, la que se prolongó por algún tiempo, éstos corroboraron que el conductor de ese vehículo fue siempre el apelante y que el carro pertenecía al bufete del cual éste era uno de sus socios principales.

A ello debemos añadir la descripción ofrecida por la víctima, la que aunque imprecisa por sus reconocidas limitaciones, coincidían en cuanto a importantes detalles con las características físicas del acusado. Las anteriores circunstancias, unidas a las expresiones incriminatorias del acusado al ser arrestado, las que fueron admitidas en evidencia, permitían formar un juicio confiable sobre la identificación del acusado. Además, esa prueba fue aquilatada por el jurado, el cual le dio credibilidad y la creyó adecuada y suficiente para establecer la correcta identificación del apelante, en vista de las garantías circunstanciales de confiabilidad que esa prueba ofrecía. No podemos imputarle al jurado el haber obrado caprichosamente al evaluar esa prueba. La misma permitió identificar al apelante como el autor de los hechos, por lo que resultó convicto, más allá de duda razonable.

Resolvemos, por tanto, que el primer error señalado no se cometió. Además, como se recordará, este asunto había sido ya adjudicado por este Tribunal, de cuya decisión se recurrió al Tribunal Supremo, el cual denegó el recurso. Por lo tanto, lo allí resuelto constituye de todos modos la ley del caso.

**B. Segundo y tercer señalamiento de error: prueba pericial presentada sobre la capacidad mental de la víctima para consentir a la relación sexual.**

El apelante cuestiona la opinión pericial del Dr. Francisco Umpierre en cuanto a que la víctima no tenía capacidad para consentir. Arguye que los testimonios del doctor Umpierre y de la doctora Román tendieron más bien a establecer que la víctima sí estaba capacitada para consentir a una relación sexual.

Es bien conocido que los tribunales tienen amplia discreción en cuanto a la apreciación de la prueba pericial. *Die-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150 D.P.R. 658 (2000); *Culebra Enterprises Corp. v. E.L.A.,* 143 D.P.R. 935 (1997); *Valldejuli Rodríguez v. A.A.A.,* 99 D.P.R. 917 (1971); *Prieto v. Maryland Casualty Co.,* 98 D.P.R. 594 (1970). En esa dirección ha señalado el Tribunal Supremo que *"ningún tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo, sobre todo cuando está en conflicto con testimonio de otros peritos y todo el tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte*

*ser técnicamente correcta." Culebra Enterprise Corp. v. E.L.A.*, *supra; Pueblo v. Canino Ortiz*, 134 D.P.R. 796 (1993); *Prieto v. Maryland Casualty Co.*, *supra*. La anterior doctrina es igualmente aplicable a la labor revisora de este Tribunal, el cual está en igual posición que el foro de primera instancia al evaluar y pasar juicio sobre prueba pericial. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, 165 D.P.R. \_\_\_\_ (2005); *López Delgado v. Cañizares*, **2004 J.T.S. 165**, 162 D.P.R. \_\_\_\_ (2004).

La Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV, R. 53, regula lo relativo al testimonio pericial. A tales efectos dispone:

*"(A) Toda persona está cualificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para cualificarla como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberán ser probados antes de que el testigo pueda declarar como perito.*

*(B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de un testigo pericial podrán ser probados por cualquier evidencia admisible, incluyendo su propio testimonio."*

Como se desprende de la disposición anterior, el peritaje puede ser producto de educación formal o de conocimientos adquiridos por la experiencia. E. Chiesa, *Tratado de Derecho Probatorio,* Volumen I, **Publicaciones JTS**, 1998, página 562. *Louisell & Mueller, Federal Evidence*, Vol. 3, L.C.P.-B.W., sec. 381 (1979); *Weinstein & Berger, Weinstein's Federal Evidence*, Vol. 4, 2nd Edition, Matthew Bender, sec. 702.064 (1999). Según señala el profesor Chiesa, el valor probatorio del testimonio pericial depende de varios factores, entre los que se destacan los siguientes: 1) las cualificaciones del perito; 2) la solidez de las bases de su testimonio; 3) la confiabilidad de la ciencia o técnica subyacente; y 4) la parcialidad del perito. E. Chiesa, *ob. cit.*, pág. 593.

Por otro lado, las Reglas 56 y 58 de Evidencia, 32 L.P.R.A. Ap. IV, R. 56 y R. 58, tratan las bases de la opinión pericial y el momento idóneo para revelar las mismas. La Regla 56 de Evidencia dispone:

*"Las opiniones o inferencias de un testigo pericial pueden estar basadas en hechos o datos percibidos por el perito o dentro de su conocimiento personal o informados a él antes de o durante el juicio o vista. Si se trata de materia de naturaleza tal que generalmente los expertos en ese campo descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, la materia no tiene que ser admisible en evidencia."*

La Regla 58 de Evidencia dispone:

*"Un perito puede declarar en términos de opiniones o inferencias y expresar las razones en que funda su testimonio, sin que antes de declarar haya expresado los hechos o datos en que sus opiniones e inferencias están basadas, salvo que el Tribunal así lo disponga. El perito puede, en todo caso, ser contrainterrogado en relación a la materia en que basa sus opiniones o inferencias, quedando obligado a revelar la misma."*

En cuanto a la solidez de la base de la opinión pericial, la liberalidad de las Reglas 56 y 58 de Evidencia, *supra*, no significa que dos opiniones tengan igual valor probatorio porque ambas descansen en bases permisibles. E. Chiesa, *ob. cit*, pág. 594. Es norma reiterada que el juzgador (juez o jurado) no está obligado a dar crédito a la opinión pericial. *"La función esencial del jurado es adjudicar los hechos, esto es, recibir y evaluar la evidencia presentada en el juicio y llegar a las conclusiones de hechos correspondientes."* E. Chiesa, Ernesto L., *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Volumen II, sec. 15.4.

Una cuidadosa lectura y análisis de la transcripción revela que, en general, los testimonios de los referidos

peritos, Dr. Umpierre y Dra. Román, uno de cargo y otro de la defensa, establecen un grado de incapacidad tal de la víctima que la inhabilitaba para consentir legalmente a una relación sexual.

El Dr. Umpierre testificó que conforme a las pruebas de inteligencia practicadas a Vanessa, en cuanto a su juicio social, que abarca su capacidad para juzgar lo que debe o no hacer, reflejaba un retardo mental moderado. Con respecto a la capacidad de Vanessa para consentir a una relación sexual, el Dr. Umpierre concluyó, no sólo a base de las pruebas realizadas, sino de sus entrevistas y todo el cuadro clínico de la joven, que ella carecía de tal capacidad. Catalogó la edad mental de Vanessa entre los cinco y seis años de edad. A igual conclusión arribó la Dra. María Román Orta, testigo de cargo. Aunque en un momento dado expresó, algo vacilante, según se desprende de la transcripción de la prueba, que Vanessa estaría capacitada para consentir al acto sexual, a renglón seguido condicionó esa respuesta y finalmente opinó que *". . . entiendo de (sic) que su juicio en ese momento dado no está capacitado para consentir."* ▓

Ahora bien, no obstante lo respetable que puedan ser estas opiniones periciales, el jurado tuvo también oportunidad de escuchar prueba de las enfermeras y de otro personal que cuidaba o interactuaba cotidianamente con Vanessa en el Centro que la albergaba. El testimonio de estos testigos retratan a una persona que apenas podía asearse a sí misma, que había que instruirla hasta en la manera de lavarse la cabeza y otras partes de su cuerpo, que necesita ayuda para vestirse, para preparar su cama, que requería supervisión y asistencia todo el tiempo ya que, de lo contrario, no podía hacer las cosas o las hacía mal. La enfermera Adela Cruz, a preguntas del Ministerio Público la describió como una niña de 8 años. ▓ Es importante destacar que tal descripción era contemporánea con la fecha de los hechos. De ella resulta fácil entender porqué Vanessa se encontraba recluida en una institución como la que la albergaba.

No hay que ser un facultativo psiquiátrico o un experto en conducta humana para concluir que una persona con las características que exhibía esta joven no tiene la capacidad para consentir a un acto sexual. Nótese que nuestro ordenamiento criminal vigente a la fecha de estos hechos colocaba en 14 años (ahora en 16 en el nuevo Código Penal) la edad para poder consentir legalmente a sostener relaciones sexuales. La descripción de Vanessa que, con evidente espontaneidad, hicieron las empleadas del Centro bajo el criterio más laxo y favorable al acusado, no permitía adscribirle de modo alguno una edad mental compatible con una adolescente de 14 ó 15 años. Las opiniones de los peritos y el testimonio de otros testigos, incluyendo al propio Dr. Umpierre, la ubicaban en una edad mental entre 5 y 8 años de edad. Estas edades lucen absolutamente congruentes con la persona descrita por los distintos testigos que interactuaban cotidianamente con ella para la fecha de los hechos. Más aún, resultan congruentes con la persona que el jurado tuvo oportunidad de observar y evaluar en la silla testifical varios años más tarde cuando Vanessa prestó testimonio con una edad cronológica todavía mayor.

La realidad descrita por estos testigos, la cual no pudo ser impugnada, derrota el planteamiento de la defensa en cuanto a que Vanessa podía consentir a una relación sexual, no obstante el hecho de su retardación mental. Lo anterior nos conduce precisamente a la consideración del próximo señalamiento de error, el cual, al igual que los que ahora nos ocupan, tampoco se cometió.

### C. Cuarto señalamiento de error: Ley 141 del 14 de diciembre de 1997.

El apelante sostiene como cuarto error que el TPI se negó a resolver que la Ley Núm. 141, al viabilizar el matrimonio de personas con retardación mental leve o moderada, reconoce de manera implícita que también pueden consentir a una relación sexual.

La Ley Núm. 141 enmienda el Código Civil y las Leyes Núm. 133 del 1937 y Núm. 64 del 1945 a los fines de permitir contraer matrimonio a personas con retardación mental cuya condición les permita prestar su consentimiento. En esa dirección elimina el término *"idiotez"* en referencia a las personas que padecen de retardación mental. Además, excluye como causa de nulidad de matrimonio este tipo de retardación cuando

dicha condición permita la prestación del consentimiento.

Según establece la Exposición de Motivos, ▇▇ mediante la Ley Núm. 141, la Asamblea Legislativa reconoció *"el valor que las personas con retardación mental tienen en una sociedad pluralista y democrática, por lo que resuelve eliminar las limitaciones impuestas en el pasado a la capacidad legal de éstas para contraer matrimonio **cuando dicha condición no les impida prestar su consentimiento.**"* (Énfasis nuestro)

Es evidente del referido estatuto que el mismo establece como criterio controlante y esencial la capacidad de la persona que sufre algún grado de retardación para consentir al matrimonio. Este requisito se mantiene claramente en la Ley. Por ello, la prohibición continúa para personas que, según el estatuto, sufren de retardación severa o profunda.

No obstante lo anterior, no cabe duda de que el criterio rector sobre la severidad de la condición mental de la persona no tiene que estar basado exclusivamente en el frío resultado de una prueba de inteligencia. Otros criterios, como el cuadro clínico general de la persona, la evaluación a base de entrevistas y la observación de su comportamiento y desempeño, también pueden permitir a un profesional de la conducta concluir sobre la capacidad para consentir de esa persona.

Precisamente, el planteamiento del apelante está basado en criterios técnicos sobre el nivel de retardación mental que surge de las pruebas de inteligencia practicadas a Vanessa, y en que una persona con retardación mental leve o moderada puede contraer matrimonio, conforme a la Ley Núm. 141. Este estatuto, en efecto, liberaliza las rígidas prohibiciones que surgían de leyes anteriores en cuanto a la capacidad legal de personas con retardación mental para contraer matrimonio. Sin embargo, más allá de las sofisticaciones técnicas o teóricas de ese señalamiento, no hay manera de concluir que una persona como la descrita por los testigos, incapaz de realizar rudimentarias tareas del diario vivir, como asearse y vestirse por sí sola, pueda contraer matrimonio y asumir las más básicas y elementales obligaciones conyugales. Tal planteamiento en el presente caso sólo puede ser manejado y considerado en un plano conceptual y teórico, mas no corresponde a la realidad concreta de la persona de Vanessa. La Ley Núm. 141 aún mantiene la prohibición de contraer matrimonio para las personas que por su enfermedad o retardación mental estén impedidos de prestar su consentimiento. Entendemos que éste precisamente es el caso de Vanessa.

Reiteramos que Vanessa ni tenía capacidad legal para consentir al matrimonio ni para el acto sexual, que es el principio rector a considerar. Como hemos indicado, tal evaluación no puede descansar únicamente en el resultado de una prueba. Se requiere hacer una evaluación general y abarcadora de la persona, de suerte que se pueda obtener un cuadro completo de la verdadera naturaleza y severidad de sus limitaciones. Se trata de una evaluación multidimensional y no fundamentada en un sólo criterio. El jurado tuvo ante sí suficiente evidencia que le permitió concluir que esta persona, por las limitaciones objetivas de la que adolecía, no podría jurídica ni humanamente contraer matrimonio, ni tampoco prestar consentimiento con el juicio requerido para sostener relaciones sexuales.

**D. Quinto señalamiento de error: exclusión de evidencia sobre conducta sexual previa de la víctima.**

Argumenta el apelante que erró el TPI al no permitirle al apelante presentar prueba sobre la conducta sexual de la víctima. La Regla 21 de Evidencia, 32 L.P.R.A. Ap. IV, R. 21, y la Regla 154.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 154, establecen la regla general de que en los procedimientos por el delito de violación o su tentativa, no se admitirá prueba de la conducta previa o historial sexual de la víctima, así como evidencia de opinión o reputación para atacar su credibilidad o para establecer su consentimiento. Ello así, a menos que existan circunstancias especiales que indiquen que dicha evidencia es relevante y que su naturaleza inflamatoria o perjudicial no tendrá un efecto mayor que su valor probatorio.

Conforme a la referida Regla 154.1, si el acusado desea ofrecer evidencia sobre tal conducta o historial sexual bajo la excepción de que existen circunstancias especiales, deberá presentar una moción por escrito y bajo juramento al Tribunal en la que indique la evidencia que desea ofrecer y su relevancia para atacar la credibilidad o para establecer el consentimiento de la perjudicada. Si el Tribunal determina que dicha evidencia es satisfactoria, ordenará una vista en privado y en ausencia del jurado, en la cual permitirá el interrogatorio a la perjudicada en relación con esa evidencia. Al terminar la vista, si el Tribunal así lo determina, emitirá una orden en la que indique cuál evidencia, si alguna, puede ser presentada, bajo la condiciones que estime necesaria.

En el presente caso, el TPI determinó que no se permitiría testimonio sobre la conducta sexual previa de Vanessa. En su facultad discrecional entendió que no estaban presentes circunstancias especiales que justificaran acceder a la presentación de esa prueba. No encontramos que haya incidido el TPI en tal decisión. La admisión de prueba sobre el historial sexual de la víctima podría provocar el efecto que las reglas antes mencionadas precisamente procuran evitar. No se juzgaba en ese momento el pasado de esta joven, sino, en esencia, si ésta tenía la capacidad mental para consentir a una relación sexual. Su historial sexual, incluso el que hubiera podido haber sido víctima en ocasiones previas de similar experiencia, resultaba impertinente al caso de autos. En todo caso, de ello haber ocurrido, se hubiera tratado muy probablemente de conducta igualmente delictiva, por lo que ella no abonaba apreciablemente a la defensa del caso.

Así las cosas, la naturaleza inflamatoria o perjudicial de esa prueba podría haber sido mayor que el valor probatorio, si alguno, que podía contener, que es objetivamente muy escaso en una acusación como la que nos ocupa por violación técnica. Evidencia de este tipo podría más bien distraer al jurado, en lugar de probar consentimiento o atacar la credibilidad de la testigo. Las reglas antes mencionadas y la sana política pública sobre las que ellas se asientan son claras en cuanto a evitar esos efectos. Coincidimos con el Procurador General con respecto a que el historial sexual de Vanessa en nada abona a la interrogante de si ésta tenía o no capacidad mental para consentir.

Resolvemos que el quinto error señalado no se cometió.

**E. Sexto señalamiento de error: medicamentos administrados a la víctima durante el juicio.**

El apelante plantea que el TPI debió disolver el jurado porque alegadamente la víctima estuvo incorrectamente medicada, durante todas las etapas del proceso judicial, lo que alteraba su funcionamiento. Ello alegadamente violó su derecho a un juicio justo e imparcial y su debido proceso de ley. La duda sobre los efectos que los medicamentos tuvieron en ella no es en las presentes circunstancias una razón suficiente en derecho para disolver el jurado y declarar un *"mistrial"*, conforme a la Regla 144 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 144.

El contenido del testimonio de Vanessa, según surge de la transcripción de la vista, permitía al jurado hacer una evaluación de sus méritos y aquilatar o juzgar su valor probatorio, en conjunto con la totalidad de la prueba que tuvo ante sí. El comportamiento de Vanessa en la silla testifical fue en efecto algo inusual o irregular, lo cual pudo deberse a varios factores. Por ejemplo, la propia condición de retardación y de bipolaridad que sufría, la natural tensión que le provocaba su comparecencia al Tribunal y el disloque que ello suponía en su rutina diaria, e incluso también podía incidir en ese comportamiento una inadecuada medicación.

No obstante, notamos del testimonio de algunos testigos sobre el típico comportamiento de Vanessa al interactuar con ella, que el mismo no se diferenciaba apreciablemente del asumido en el Tribunal. El comportamiento descrito por los funcionarios del Centro, así como el del Dr. Umpierre y la Dra. Román, proyectaban una persona parlanchina, impetuosa, sin controles adecuados, de pobre juicio social en su desenvolvimiento o modo de expresarse. Nótese que, por ejemplo, en su entrevista con el Dr. Umpierre, se *"antojaba de juguetes"* que veía en la oficina y había que entregárselos para que pudiera fluir la entrevista. Se

recordará que ellos la describían como una niña. No hay grandes contrastes entre el comportamiento de ella fuera del Tribunal y el que exhibió en Sala. Sin embargo, a pesar de lo irregular de su testimonio por el atípico comportamiento asumido en el Tribunal, el cual provocó incluso recesos para atender distintos incidentes provocados por Vanessa, su testimonio ofreció al jurado relevante información sobre aspectos esenciales de los hechos por los que se acusó al apelante. Además, éste fue sustancialmente consistente con sus declaraciones previas y con las de otros testigos.

El testimonio de una víctima de violación con incapacidad mental, no es tan distinto al de una víctima menor de edad, el cual muchas veces puede contener contradicciones o imprecisiones, pero que, a la vez, se caracteriza por la sinceridad de su testimonio. *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988). Aún así, es conocida la doctrina de que el hecho de que un testigo incurra en ciertas contradicciones no impide que el tribunal, en este caso el jurado, le dé crédito a su testimonio, máxime cuando el resto de la prueba indica que nada increíble, improbable o inverosímil se desprende de éste. *Pueblo v. Torres Villafañe*, 143 D.P.R. 474 (1997).

Al estimar o juzgar la credibilidad de una perjudicada en casos de esta naturaleza, el Tribunal Supremo ha señalado que hay que tomar en cuenta su edad, nivel de escolaridad, grado de estabilidad familiar y las posibles reacciones del trauma psicológico causado por el daño infligido durante el período en que la víctima fue abusada sexualmente. *Pueblo v. Rivera Robles, supra.* A ello hay que añadir otros elementos presentes en este caso, como el de la retardación mental y la bipolaridad, así como la capacidad de la víctima para comunicarse, entre otros. Incongruencias o impresiones, ubicadas en su debido contexto, no deben *ipso facto* macular o desmerecer la credibilidad de estos testigos. Esta evaluación hay que hacerla a la luz de la totalidad del testimonio de la víctima y el de los demás testigos o prueba presentada. Ésa es y así fue en este caso, tarea del jurado, que no tenemos razones fundadas para cuestionar. Reconocemos que el comportamiento o *"demeanor"* de un testigo en la silla testifical es esencial para aquilatar la sinceridad y credibilidad de su testimonio. *Pueblo v. Torres Villafañe, supra.* Sin embargo, es igualmente menester reconocer que en el presente caso el jurado estuvo en mejor posición para aquilatar el comportamiento de Vanessa durante su testimonio.

Asimismo, en nuestro ordenamiento evidenciario la declaración de un testigo que sea creído por el juzgador de los hechos es suficiente para establecer cualquier hecho, aunque no se trate de un testimonio *"perfecto"* o libre de contradicciones. *Pueblo v. Mejías, supra*; *Pueblo v. Chévere Heredia*, 139 D.P.R. 1, 15 (1995); *Pueblo v. Rodríguez Román*, 128 D.P.R. 121, 128 (1991); *Pueblo v. Acevedo Quiñones*, 100 D.P.R. 894, 899 (1972); véase, además, 32 L.P.R.A. Ap. IV, R. 10(D). Es al juzgador de los hechos al que le corresponde adjudicar la credibilidad de un testigo, cuando haya partes de su testimonio que no sean claras, precisas o que resulten contradictorias. El sólo hecho de que existan contradicciones en la declaración de un testigo, de por sí, no justifica que se rechace esa declaración en su totalidad, si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable. *Pueblo v. Chévere Heredia, supra*, a la pág. 15; *Pueblo v. Pagán Ortiz*, 130 D.P.R. 470, 483 (1992); *Pueblo v. Rodríguez Román, supra*, a la pág. 129. Tratándose del testimonio de una testigo con las conocidas limitaciones de Vanessa, como cuando se trata de un menor de temprana edad, esta doctrina tiene aún más fuerza y laxitud.

Considerar el hecho de si Vanesa estaba o no adecuadamente medicada o si su testimonio hubiera sido notablemente diferente por esa razón, implicaría entrar en un innecesario e impermisible proceso de especulación al aquilatar esa prueba, cuando el récord refleja un comportamiento en la silla testifical consistente con el que ella exhibe típica u ordinariamente. Entendemos que la alegada ausencia de certeza sobre los medicamentos administrados a Vanessa no debe incidir sobre la credibilidad que el jurado le adjudicó a su testimonio a la luz de la totalidad de las circunstancias que rodearon este proceso, anteriormente comentadas. Además, su testimonio fue esencialmente similar al prestado en ocasiones previas, según lo declarado por otros testigos. ▮

Por último, debemos tener presente que, además del testimonio de Vanessa, el Ministerio Público presentó evidencia independiente y suficiente en derecho que le permitía al jurado poder arribar a la misma determinación. Cualquier error en cuanto al valor probatorio del testimonio de la víctima por razón de su medicación, no incide sobre el resto de la prueba presentada en el juicio, la que era, de suyo, suficiente para determinar la culpabilidad del apelante.

Resolvemos que el sexto error señalado no se cometió.

**F. Séptimo señalamiento de error: declaraciones del acusado al momento de su arresto.**

El séptimo señalamiento de error versa sobre la admisibilidad del testimonio del fiscal Román Muñiz Santiago sobre las declaraciones que hizo el apelante al momento de su arresto y la omisión de fiscalía de no producir esa prueba a pesar de haber sido requerida en el descubrimiento de prueba. Se trata de la expresión del acusado, *"Dios mio qué he hecho. He manchado el nombre de mi hijo y de su carrera"*.

Como señalamos anteriormente, esta controversia ya fue traída ante este Foro en el caso KLCE-2003-01302, en el que se resolvió que esas declaraciones eran admisibles. En el auto de *certiorari* se alegó que el tribunal de instancia erró al no suprimir las admisiones incriminatorias por ser producto del *"árbol ponzoñoso"*, ya que fueron el resultado del allanamiento que se declaró nulo. Este Tribunal resolvió que: *"de la prueba surge que las manifestaciones hechas por el acusado fueron hechas (sic) de manera espontánea luego de que se le hicieran las advertencias legales. No medió un interrogatorio por parte de los funcionarios del Estado a esos efectos. La renuncia del acusado al derecho a no autoincriminarse fue una inteligente."* Véase KLCE-2003-01302. Posteriormente, se recurrió al Tribunal Supremo mediante petición de *certiorari* CC-03-0834, la cual fue denegada y, por ende, permaneció inalterada la decisión de este Tribunal. Ello, por tanto, constituye la ley del caso y por considerarla esencialmente correcta, no habremos de intervenir ni alterar esa decisión. *Management Administration Service v. Estado Libre Asociado,* 152 D.P.R. 599 (2000); *In re: Tormos Blandino,* 135 D.P.R. 573 (1994); *Torres Cruz v. Municipio de San Juan,* 103 D.P.R. 217 (1975).

En cuanto al planteamiento de la omisión en el descubrimiento de prueba, la Regla 95 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 95, dispone:

*"Regla 95. Descubrimiento de Prueba del Ministerio Fiscal en favor del acusado.*

*(a) Previa moción del acusado sometida en cualquier momento después de haberse presentado la acusación o denuncia, y dentro del término prescrito para someterla, el tribunal ordenará al Ministerio Fiscal que permita al acusado inspeccionar, copiar o fotocopiar el siguiente material o información que está en posesión, custodia o control del Ministerio Fiscal:*

*(1) Cualquier declaración jurada que el Ministerio Fiscal tenga del acusado.*

*(2) Cualquier declaración jurada de los testigos de cargo que hayan declarado en la vista para determinación de causa probable para el arresto o citación, en la vista preliminar, en el juicio o que fueron renunciados por el Ministerio Fiscal y los récord de convicciones criminales previas de éstos.*

*(3) Cualquier resultado o informe de exámenes físicos o mentales y de experimentos o pruebas científicas que sea relevante para preparar adecuadamente la defensa del acusado o que vaya a ser utilizado en el juicio por el Ministerio Fiscal.*

*(4) Cualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el Ministerio Fiscal se propone utilizar en el juicio*

*o que fue obtenido del acusado o perteneciera al acusado.*

 *(5) El récord de convicciones criminales previas del acusado.*

 *(6) Cualquier informe preparado por agentes de la Policía en relación con las causas seguidas contra el acusado que sea relevante para preparar adecuadamente la defensa del acusado. El descubrimiento de esta prueba estará sujeto a las siguientes condiciones:*

*(A) Que los objetos, libros, documentos y papeles que el acusado interesa examinar se relacionan o describen con suficiente especificación;*

*(B) que no afecte la seguridad del Estado ni las labores investigativas de sus agentes policíacos, y*

*(C) que la correspondiente moción del acusado sea presentada con suficiente antelación a la fecha señalada para la celebración del juicio, de manera que no haya innecesarias dilaciones en los procedimientos ni se produzcan molestias indebidas a los funcionarios del Estado.*

 *(b) El Ministerio Fiscal revelará toda aquella evidencia exculpatoria del acusado que tenga en su poder.*

 *(c) El Ministerio Fiscal deberá informar al tribunal si el material o la información solicitada no se encuentra en su posesión, custodia o control, en cuyo caso el tribunal ordenará a la persona o entidad que la posea, custodie o controle, que la ponga a la disposición del acusado.*

 *(d) No estarán sujetos a descubrimiento o inspección de la defensa los escritos de investigación legal, informes, memorandos, correspondencia u otros documentos internos que contengan opiniones, teorías o conclusiones del Ministerio Fiscal."*

 Tiene razón el Procurador General con respecto a que no existía obligación del Ministerio Público de descubrir la referida admisión del acusado. Ninguna de las disposiciones de la Regla 95, antes transcrita, cubren la prueba en cuestión. Esta evidencia consiste de una declaración espontánea, de testimonios o declaraciones de testigos y del acusado en la etapa investigativa. Tampoco se trataba claramente de prueba exculpatoria. .

 No obstante lo anterior, aun asumiendo, *argüendo*, que se trató de una evidencia erróneamente admitida por la omisión de descubrirla, de todos modos se hubiera tratado de un error no perjudicial. La inadmisibilidad de esa prueba no hubiera alterado el resultado del veredicto. Tal declaración no constituia una pieza de evidencia esencial en el caso al grado de que sin ella no hubiera podido encontrarse culpable al apelante. La prueba de cargo, con o sin la referida evidencia, era, de suyo, suficiente para establecer la comisión de los delitos por los que el apelante resultó convicto.

 Se recordará que, conforme a la Regla 5 de Evidencia, el Tribunal Supremo de Puerto Rico ha adoptado la doctrina de error perjudicial. En ese sentido, en palabras del Profesor Chiesa: *"el error en la admisión o exclusión de evidencia no acarrea revocación a menos que – mediando oportuna y correcta objeción- el tribunal apelativo estime que el error cometido fue factor decisivo o sustancial en la sentencia o decisión objeto de revisión".* (Énfasis en original) Véase, Chiesa, *Práctica Procesal Puertorriqueña – Evidencia*, San Juan, **Publicaciones J.T.S.**, 1979, pág. 8; *Pueblo v. Martínez Solís,* 128 D.P.R. 135, 168 (1991), y *Pueblo v. Ruiz Bosch,* 127 D.P.R. 762, 782 (1991). *"El criterio para determinar si un error en materia de evidencia acarrea revocación es determinar si, de no haberse cometido el error, probablemente el resultado hubiese sido distinto". Pueblo v. Mangual Hernández,* 111 D.P.R. 136, 145 (1981). Como hemos señalado antes, aun habiéndose incurrido en un error, el mismo habría sido uno no perjudicial.

El séptimo error señalado no se cometió.

**G. Octavo señalamiento de error: el delito de sodomía es inconstitucional a base de lo resuelto en *Lawrence v. Texas*, 123 S.Ct. 2472 (2003), y por vaguedad.**

En el caso de autos, los delitos que pesan contra el apelante están gobernados por el Código Penal de 1974, *Pueblo v. González*, **2005 J.T.S. 131**. El artículo 103 del Código Penal de 1974 disponía que:

*"Toda persona que sostuviere relaciones sexuales con una persona de su mismo sexo o cometiere el crimen contra natura con un ser humano será sancionada con pena de reclusión por un término fijo de seis (6) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cuatro (4) años."*

La pena de reclusión será por un término fijo de doce (12) años, cuando el acto de sodomía se cometa en cualquiera de las siguientes modalidades:

*"(a)....*

*(b)....*

*(c) Si la víctima, por enfermedad o defecto mental temporero o permanente, estuviere incapacitada para comprender la naturaleza del acto en el momento de su realización."* (Énfasis nuestro)

En *Lawrence v. Texas, supra,* la controversia presentada ante el Tribunal Supremo de Estados Unidos giraba en torno a la validez de una legislación del estado de Texas en la que se penalizaba a las personas del mismo sexo que sostuvieran relaciones sexuales consensuales e íntimas. El Código Penal de Texas dictaminaba que: *"[a] person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex."* El Tribunal Supremo de los Estados Unidos limitó el alcance de su decisión declarando inconstitucional esa disposición cuando, *"envuelve dos adultos, quienes con completo y mutuo consentimiento, se involucraron en una práctica sexual común al estilo de vida homosexual"* Lawrence v. Texas, supra, pág. 525. (Traducción nuestra)

Claramente, ese no es el caso de autos. El jurado determinó que el acto de sodomía realizado por el apelante con la víctima incapacitada ocurrió sin el consentimiento de ésta, por razón de su incapacidad mental, de manera que se trata de controversias completamente distintas. Además, la Ley de Texas anulada en *Lawrence, supra,* penalizaba la relación consensual consentida entre homosexuales y no entre personas heterosexuales. El Tribunal Supremo de Estados Unidos entendió que el estatuto infringía el derecho a la libertad y a la intimidad, que emanan de la cláusula del debido proceso de ley de la Enmienda Decimocuarta de la Constitución de Estados Unidos. Esa enmienda garantiza el derecho a la intimidad de adultos al momento de escoger con quién sostener relaciones sexuales íntimas.

En el caso que nos ocupa, al apelante se le imputó sostener relaciones sexuales por la vía anal con la víctima, quien **no estaba capacitada para consentir.** A pesar de que Lawrence invalidó la modalidad del delito de sodomía entre dos adultos que consienten libremente, el caso en nada afecta la situación del caso de autos, el cual se trata, según el pliego acusatorio, de actos no consentidos por el impedimento mental de la víctima.

Por otro lado, una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. *Pacheco Fraticelli v. Cintrón*, 122 D.P.R. 229 (1988). Con ello se procura evitar que leyes imprecisas puedan engañar o inducir a error a una persona inocente al no proveer un aviso adecuado de cuál es la conducta prohibida. No obstante, sobre la alegada vaguedad del Art. 103 del Código Penal de 1974, el Tribunal Supremo ha establecido

que el mismo da un aviso justo y adecuado a la ciudadanía sobre cuál es la conducta que prohíbe, al menos, en cuanto a actos de somodomía involuntarios y en los que involucra a menores o incapacitados para consentir. Lo anterior sin duda resiste aún el más riguroso escrutinio que podamos aplicar bajo los estándares de la cláusula del debido proceso de ley. El interés que protege dicho artículo es incuestionablemente más que apremiante.

Resolvemos, por tanto, que el octavo error señalado no se cometió.

## H. Noveno señalamiento de error: insuficiencia de la acusación.

El noveno error se refiere a la insuficiencia de la acusación en cuanto al delito de violación, por haberse omitido alegar el elemento de no tratarse de la mujer o esposa del acusado. El Artículo 99 del Código Penal de 1974, 33 L.P.R.A. § 4061, establece:

Se impondrá pena de reclusión según se dispone más adelante a toda persona que tuviere acceso carnal **con una mujer que no fuere la propia**, en cualesquiera de las siguientes modalidades:

*"(a)...*

*(b) Si por enfermedad o defecto mental, temporal o permanente, estuviere incapacitada para consentir legalmente."* (Énfasis nuestro)

La acusación o denuncia tiene como propósito notificar al imputado que se ha iniciando en su contra un proceso criminal por los hechos y el delito que se le imputa. El Artículo II, sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico, dispone que el acusado será notificado de la naturaleza y causa de la acusación al recibir copia de la misma. *Rabell Martinez v. Tribunal Superior*, 102 D.P.R. 39 (1974). Esta exigencia del derecho al debido proceso de ley, requiere que el imputado esté informado de los cargos en su contra para que pueda estar en posición de defenderse. *Pueblo v. Saliva Valentín*, 130 D.P.R. 767 (1992). La acusación debe contener información suficiente, de manera que la notificación de la naturaleza y causa de los cargos sea adecuada. No es necesario que se utilicen exactamente las palabras contenidas en el Código Penal. *Pueblo v. Santiago Cedeño*, 106 D.P.R. 663 (1981).

La Regla 35 de Procedimiento Criminal, 34 L.P.R.A., Ap. II, R. 35, establece que en la acusación o denuncia se debe usar un lenguaje claro, sencillo y conciso para que una persona de inteligencia común entienda cuáles son los cargos en su contra. Por su parte, la Regla 36 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 36, establece que una acusación o denuncia no será insuficiente, ni podrán ser afectados el juicio, la sentencia o cualquier otro procedimiento basados en ellas por causa de algún defecto, imperfección u omisión de forma que no perjudiquen los derechos sustanciales del acusado.

En el presente caso, el apelante plantea que la omisión de no alegar en la acusación, *"con una mujer que no era la propia"* o algún otro lenguaje parecido, por constituir ello un elemento del delito, convierte el pliego acusatorio en uno insuficiente en derecho. No debe olvidarse que el proceso judicial en cualquier caso criminal, aunque se componga de varias etapas o procedimientos, es real e incuestionablemente uno y el mismo. Una vez el Estado **inicia** el procesamiento criminal de un ciudadano por la violación de algún estatuto penal, nace la obligación legal, de estirpe constitucional, de notificar adecuadamente a la persona de los delitos que se le imputan y los elementos esenciales que lo configuran. Es este momento crítico, cuando el Estado mueve su maquinaria coercitiva contra ese ciudadano y lo expone a la pérdida de su libertad, que se hace efectivo y exigible ese derecho. Tal obligación del Estado de notificar se satisface preeminentemente mediante el mecanismo de la denuncia, conforme a las Reglas 5 y 35 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, Rs. 5 y 35.

La formalidad posterior de la lectura del pliego acusatorio, la que salvo escasas excepciones sólo se contempla para el encauzamiento por delitos graves, importante como es, en esencia ratifica y pone sobre aviso al ahora acusado de los cargos por los que habrá de ser finalmente juzgado. Las reglas y formalidades procesales del trámite judicial persiguen objetivos razonables. La denuncia, al igual que la acusación, adelantan el propósito ya indicado de poner al tanto a un ciudadano imputado de violar la ley de los delitos por los que se le acusa y los elementos que lo componen, a fin de que pueda preparar su defensa contra esos cargos. La pregunta que debemos formularnos en este caso es si el apelante en algún momento oportuno del trámite judicial luego del inicio de su procesamiento criminal, se le advirtió o notificó sobre el particular. Una somera lectura de la denuncia notificada al apelante nos permite responder en la afirmativa a esa pregunta.

El referido acusado, Raúl E. González Díaz, allá para el 13 de septiembre de 1997, en Caimito, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de San Juan, ilegal, voluntaria, maliciosa, a sabiendas y con la intención criminal, en concierto y común acuerdo con la Sra. Xiomara Monarca, participó y ayudó a éste a sostener acceso carnal en la persona de Vanessa Torres Monarca, *mujer que no era la propia*. Que al momento de sostener el acusado dicho acto la perjudicada tenía problemas de retardación mental y es hija biológica de la co-acusada. Dicho acto consiste en que el acusado le penetró su pene erecto por la vagina de la perjudicada. Denuncia por el delito de violación, apéndice del apelado, pág. 11.

El proceso criminal, desde que se convierte a un ciudadano en sospechoso de la comisión de un delito hasta la lectura de la sentencia condenatoria, si tal fuera el resultado, es uno y el mismo, como ya señalamos. Es por ello que en el caso de autos, una vez notificado y advertido el apelante en la denuncia de los delitos por los que habría de procesársele, y en la que se alegó específicamente el elemento de *"mujer que no era la propia"*, al formalizarse más tarde la acusación por los mismos delitos y en las mismas modalidades, la omisión del referido elemento se tornó en un mero defecto de forma, que no invalidaba el pliego acusatorio.

Frente a tal escenario, no se puede en rigor afirmar que con dicha omisión se le ha causado al apelante una lesión grave a su derecho constitucional a una notificación adecuada de los cargos en su contra. Téngase presente que, además de que ya mediante la formalidad de la renuncia se había logrado sustancialmente el mismo propósito, la lectura de la acusación estuvo precedida de una vista preliminar, conforme a la Regla 23 de Procedimiento Criminal, en la que el Ministerio Público estaba obligado a pasar prueba sobre todos los elementos del delito imputado. Asimismo, el imputado tenía el derecho a contrainterrogar la prueba de cargo y ofrecer evidencia en su defensa. Se recordará que en el caso de autos se celebró adicionalmente una vista en alzada. Finalmente, a la luz de la prueba presentada, el Tribunal determinó causa probable para acusación **por los mismos delitos y en las mismas modalidades** que los imputados en la denuncia. Como puede observarse, a través de este largo proceso, el imputado tuvo la oportunidad adicional de conocer y relacionarse con la prueba de cargo, incluyendo la atinente a los elementos del delito. Por lo tanto, en el presente caso los eventos que antecedieron a la lectura de la acusación antes comentados, lograron satisfacer la exigencia constitucional de una adecuada notificación al apelante de los cargos en contra.

Por último, como expresó correctamente el foro de instancia, en casos de violación técnica que, como se sabe, involucra a menores de 14 años y a incapacitados mentales, el mencionado elemento de ausencia de relación conyugal resulta esencialmente redundante o inconsecuente. Esto es así, puesto que por requerimiento de Ley, de lo cual debemos imputarle conocimiento al apelante, estas personas están impedidas de contraer matrimonio. Por ello precisamente es que *a priori* el estatuto penal prohíbe sostener relaciones sexuales con estas personas. La defensa, sin embargo, rechaza este fundamento, aduciendo que tal inferencia ya no es válida en la medida que la Ley Núm. 141, *supra*, autoriza matrimonios entre personas con algún grado de retardación mental, como mencionamos anteriormente.

No nos convence ese argumento de la defensa. Entendemos que existe armonía entre el lenguaje de la Ley 141 y el Art. 99 del Código Penal entonces aplicable. El lenguaje del Art. 99 era; *"si por enfermedad o defecto*

*mental . . . estuviera **incapacitada para consentir** legalmente*", mientras que el Art. 1 (3) de la Ley 141, mantiene la prohibición para contraer matrimonio, a *"[l]os que padecen de retardación mental y/o alguna deficiencia en el desarrollo, cuando dicha condición les impida **prestar su consentimiento**"*. (Énfasis nuestro). Los próximos dos artículos de la Ley reiteran la misma prohibición para quienes por su condición estén impedidos de prestar su consentimiento. Sostenemos, en consecuencia, que ambas disposiciones legales son armonizables. Es evidente que la modalidad *"técnica"* del delito de violación no se establece en función de la enfermedad o retardo mental propiamente, sino por razón de la incapacidad para consentir. Lo mismo ocurre con respecto a la Ley 141, la que también continúa prohibiendo el matrimonio a quien no tenga tal capacidad. Este estatuto en nada incidía sobre esta modalidad del Art. 99 del Código Penal.

La denuncia o la acusación por la violación del Art. 99 en su modalidad *"técnica"* en el presente caso descansaba en el hecho de la falta de capacidad de la víctima para prestar consentimiento, lo mismo que se contempla en la Ley 141. Se recordará que en la consideración del señalamiento de error cuarto tuvimos ocasión de pasar juicio extensamente sobre la inaplicabilidad de la Ley Núm. 141 a la perjudicada en este caso. Por lo anterior, es válido el fundamento acogido por el TPI en cuanto a que la alegación de no tratarse de su propia cónyuge resulta redundante e inconsecuente para fines de este caso, por lo que tal omisión en la acusación igualmente se tornó en un error no perjudicial.

En el caso de autos, la información contenida, tanto en la denuncia como en la acusación, notificó claramente al apelante sobre los cargos que se le imputaron. Otra interpretación nos conduciría a una interpretación lógicamente insostenible, puesto que en las presentes circunstancias colocaría la fría formalidad procesal en un fin en sí misma, desligada del fundamento o propósito al que debe su razón de ser. No hay razón para que en los procesos criminales no podamos aplicar la conocida regla hermenéutica de que la interpretación de un estatuto no pude conducir a resultados absurdos. *Pueblo v. Ríos Dávila,* 143 D.P.R. 687, 696 (1997); *Pacheco v. Vargas,* 120 D.P.R. 404, 409 (1988).

## IV

Unas consideraciones finales. Para obtener una convicción válida en derecho y derrotar la presunción de inocencia que asiste a toda persona acusada de delito, se requiere que el Estado presente prueba respecto a cada uno de los elementos del delito y que esa prueba sea suficiente para establecer la convicción más allá de duda razonable. Art. II, Sec. 2, Constitución del Estado Libre Asociado de Puerto Rico. Luego de estudiar el expediente de este caso y la voluminosa transcripción de la prueba, nuestra conciencia judicial nos lleva a concluir que el Ministerio Público cumplió con tal obligación en este caso. Estamos convencidos de que el jurado tuvo ante sí suficiente y adecuada evidencia para encontrar al apelante culpable de los delitos por los que se le acusaba más allá de duda razonable. Téngase presente que la exigencia constitucional no es proveer al acusado un proceso o juicio perfecto, libre de todo error. Ello sería una exigencia impropia para una tarea humana. Se exige, en cambio, un proceso justo, libre de errores que menoscaben sustancialmente los derechos fundamentales del acusado, especialmente su insoslayable derecho al debido proceso de ley.

Lo anterior está en armonía con la conocida doctrina de que a nivel apelativo no se intervendrá con las determinaciones de hechos y la adjudicación de credibilidad hecha por el juzgador de los hechos, salvo en caso de error manifiesto, pasión, prejuicio o parcialidad. *Argüello v. Argüello,* 155 D.P.R. 62 (2001); *Trinidad v. Chade,* 153 D.P.R, 280 (2001); *Quiñones v. Manzano,* 141 D.P.R. 139 (1996); *Orta v. Padilla,* 137 D.P.R. 927 (1995); *Vélez v. Srio. de Justicia,* 115 D.P.R. 529 (1984); *Ortiz v. Cruz Pabón,* 103 D.P.R. 939 (1975); *Rodríguez v. Concreto Mixto, Inc.,* 98 D.P.R. 579 (1970).

El foro apelativo no puede descartar livianamente las determinaciones del foro de instancia y sustituirlas por sus propias apreciaciones, basadas en el estudio del expediente del caso. *Argüello v. Argüello, supra.* La adjudicación de credibilidad del tribunal o del jurado es merecedora de gran deferencia por parte de este Tribunal por ser el que, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, puesto

que fue quien oyó y vio declarar a los testigos. *Id.; Pueblo v. Bonilla Romero*, 120 D.P.R. 92 (1987). En consideración a esa doctrina, debemos limitar nuestra intervención con el veredicto condenatorio de un jurado o de un magistrado a casos en los que realmente se evidencie una decisión injusta, contraria a derecho o en los que haya mediado prejuicio, parcialidad, error manifiesto, o cuando la apreciación de la prueba no concuerde con la realidad fáctica. *Pueblo v. Irizarry*, **2002 J.T.S. 68**; *Pueblo v. Cabán Torres, supra*; *Pueblo v. Miranda Ortiz, supra.*

En el caso ante nuestra consideración, el jurado tuvo la oportunidad de aquilatar la prueba presentada y de evaluar la credibilidad que le mereció cada uno de los testigos, así como determinar la capacidad legal de la víctima para consentir a una relación sexual. Creemos que ese asunto crucial correspondía dirimirlo al jurado por ser en esencia una cuestión de hecho. Le competía a éste formar su juicio sobre el particular, no sólo a base de la opinión de los peritos y de las pruebas psicométricas, sino a la luz de toda la prueba que tuvo ante sí sobre este asunto.

Con su veredicto, además, el jurado encontró probado que el apelante acudió a sabiendas a una institución para personas con retardación mental, y recogió a una interna del lugar, valiéndose de la colaboración de la madre de ésta. Posteriormente, sostuvo relaciones sexuales con ella cuando sabía o debió saber que Vanessa, en efecto, carecía de capacidad mental suficiente para consentir a los actos a los que la sometió el apelante. Tal juicio no nos parece prejuiciado, arbitrario o patentemente erróneo, por lo que debemos abstenernos de intervenir con esa apreciación y con el veredicto emitido.

## V

Por los fundamentos anteriormente expuestos, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal de Apelaciones.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 123

**1.** Recurso de *certiorari* KLCE-99-00930 presentado el 2 de septiembre de 1999.

**2.** De esta decisión, el apelante acudió a este Tribunal, el cual denegó expedir el recurso.

**3.** Regla 28 – Contenido de los alegatos en casos criminales. (A) Presentación del alegato de la parte apelante. La parte apelante presentará su alegato dentro del término de treinta (30) días de haberse elevado el expediente de apelación, salvo que el Tribunal de Apelaciones disponga de otra forma.

**4.** Por ejemplo, *"Lávate bien el cabello. Échate shampoo en el pelo, enjuágatelo. Lávate aquí abajo bien."* Transcripción de la prueba oral del 22 de septiembre de 2003, página 43.

**5.** *"Pero missis, atiéndame ahora. Necesito que usted me escuche ahora."* Transcripción de la prueba oral del 22 de septiembre de 2003, páginas 45 y 46.

**6.** R. *"Vanessa me refiere a mí que su mamá la llevó a un motel."*

*"P. "Unjú", R. "El motel está pintado de color de rosa."*

P. *"Unjú"*, R. *"Entonces cuando ella entra con el amigo de su mamá y ella (sic), ella se queda como sorprendida porque como ve tantos cristales, bombillas y había una bañera muy bonita que describe ella."*

*P. "Cristales, bombillas."*

*R. "Y una bañera en forma de corazón, rojo.",*

*P. "En forma de corazón. Ajá."*

*R. "Entonces, pues, su mamá le refiere a ella: "Vanessa..." Perdone estas expresiones que yo voy a usar, "Vanessa, vete a chingar que eso no es nada". Yo le digo: "Vanessa, ¿Tú estás segura? ¿Y porqué tú te expresas así?", "Sí, mamá se expresaba así". Entonces, pues, ella... el tal Juan ese comienza a quitarle la ropa. A todo esto, a ella le impresionan tanto las luces esas como si fuera una discoteca...". Transcripción de la prueba oral del 22 de septiembre de 2003, páginas 47 a la 48.*

*R. "Entonces, pues, ahí ella me dice que el caballero éste, el tal Juan pega a usarla por delante y por detrás".*

*P. "Le pregón... ¿A usarla?",*

*R. "A usarla."" Transcripción de la prueba oral, páginas 49 a la 50.*

**7.** Transcripción de la prueba oral del 22 de septiembre de 2003, página 60.

**8.** Transcripción de la prueba oral del 23 de septiembre de 2003, página 36.

**9.** *"R. "Cuando Vanessa entró a la oficina lo primero que dijo sin... sin nosotros decirle nada era que no iba a salir más con su mamá porque su mamá era mala y nos narró una situación que había pasado en... el pase."*

*P. "En el pase. Dígale a las damas y caballeros del Jurado."*

*R. "Ella... ella refiere a que... que durante el pase su mamá la llevó a un motel con un amigo que en ocasiones llamaba Juan, en ocasiones le decía el sucio o el viejo y que tuvieron relaciones sexuales en el motel."*

*P. "¿Quiénes?"*

*R. "Primero la mamá de ella y el señor Juan y después el señor Juan y ella."*

*P. "Y ella usted se refiere, ¿a quién?"*

*R. "A Vanessa." Transcripción de la prueba oral del 29 de septiembre de 2003, páginas 19 a la 26."*

**10.** Este era el nombre con el que Vanessa se refería al autor de los hechos según le representó su señora madre. Véase, nota al calce núm. 1.

**11.** Sobre el particular indicó lo siguiente:

*"R. "Bueno, en la mañana del 13 de septiembre de '97, recibí la llamada de... se identificó como la mamá de Vanessa Torres, Xiomara Monarca, y me pidió para llevarse... ella me refirió que era su hija, para llevársela a un pase de un día para otro, el cual yo le notifiqué que yo no estaba autorizada para dar un pase de un día para otro, que sí de salidas por horas."*

*P. "Unjú."*

*R. "Entonces me dijo que estaba de acuerdo, solamente la iba a llevar... más o menos una hora para llevarla para que comiera pollo con papas y que la iba a regresar al centro." Transcripción de la prueba oral del 30 de septiembre de 2003, página 15.*

**12.** Transcripción de la prueba oral de 23 de septiembre de 2003, páginas 32 a la 42.

**13.** Ese puesto acarrea tomar fotografías en las escenas y realizar trabajos de técnico de huellas digitales.

**14.** Esa cabaña concuerda con la descripción de la víctima, específicamente en cuanto al cuadro con la mujer con la pantera negra. Transcripción de la prueba oral del 2 de octubre de 2003, página 79.

**15.** Transcripción de la prueba oral del 6 de octubre de 2003, páginas 12 a la 14.

**16.** Transcripción de la prueba oral de 6 de octubre de 2003, páginas 15 a la 16 y 45 a la 46.

**17.** Transcripción de la prueba oral de 6 de octubre de 2003, página 76.

**18.** Transcripción de la prueba oral de 14 de octubre de 2003, páginas 9 a la 10.

**19.** Transcripción de la prueba oral de 14 de octubre de 2003, páginas 27 a la 31.

**20.** *R. "Todos los cuadros son diferentes."*

*P. "¿Y en esa Cabaña 57 cómo era el cuadro?"*

*R. "Era grande, tenía una mujer, una pantera negra, color negro." Transcripción de la prueba oral de 14 de octubre de 2003, página 33.*

*R. "O sea, tenía... era grande, o sea, tenía... había un "jacuzzi" en forma de corazón."*

*P. "¿Un "jacuzzi"?"*

*R. "En forma de corazón.". Transcripción de la prueba oral de 14 de octubre de 2003, página 34.*

**21.** *P. "¿Por qué se señalaba la parte de atrás?"*

*R. "Indicando que le había metido el pene por el área anal. Que la lastimó." Transcripción de la prueba oral de 15 de octubre de 2003, página 39.*

**22.** Transcripción de la prueba oral de 15 de octubre de 2003, páginas 17 a la 18.

*"P. "Testigo, le pregunto, ¿qué descripción, si alguna, ofreció Vanessa de la persona, el amigo de su mamá que le hizo todas estas cosas que usted nos ha dicho hoy?"*
*R. "Que era chiquito."*

*P. "Chiquito."*

*R. "Cara vieja, pelo con canas, huevo chiquito."*

*P. "¿Huevo chiquito?"*

*R. "Ajá. Que tenía rotitos en la cara y que usaba gafas."...*

*P. "¿Qué otra descripción, si alguna, testigo?"*

*R. "Mencionó que tenía los ojos verdes."* Transcripción de la prueba oral de 15 de octubre de 2003, páginas 37 a la 46.

**23.** R. *"Una vez que se... que llegábamos al edificio, ubicábamos que ese carro se encontraba... el Lexus se encontraba en el estacionamiento, investigábamos si había alguien dentro del bufete, nos quedábamos en las afueras esperando que el vehículo saliera a ver quién era la persona que montaba el vehículo y conducía y hacia dónde se dirigía. Así lo hicimos unas varias veces en las cuales siempre era la misma persona que conducía el vehículo."*

*P. "Y le pregunto, ¿quién era la persona que cuando usted vigilaba ese vehículo era la persona que conducía el vehículo Lexus, blanco, tablilla BGK713?"*

*R. "El señor Raúl González que está aquí sentado al lado mío." Transcripción de la prueba oral de 15 de octubre de 2003, página 51 y 52.*

24. Transcripción de la prueba oral de 15 de octubre de 2003, página 90.

25. Transcripción de la prueba oral de 14 de noviembre de 2003, páginas 20 a la 24, páginas 29 y página 60.

26. Transcripción de la prueba oral de 14 de noviembre de 2003, página 30.

27. Transcripción de la prueba oral de 23 de octubre de 2003, páginas 40 y 41.

28. Transcripción de la prueba oral de 23 de octubre de 2003, página 48.

29. Transcripción de la prueba oral de 23 de octubre de 2003, página 62.

30. Transcripción de la prueba oral de 23 de octubre de 2003, página 70.

31. Transcripción de la prueba oral de 23 de octubre de 2003, página 65.

32. Transcripción de la prueba oral de 27 de octubre de 2003, páginas 96 a 97.

33. Transcripción de la prueba oral de 27 de octubre de 2003, página 98.

34. Transcripción de la prueba oral de 3 de noviembre de 2003, página 134.

35. Transcripción de la prueba oral de 4 de noviembre de 2003, página 28.

36. Transcripción de la prueba oral de 4 de noviembre de 2003, páginas 65 a la 66.

37. Transcripción de la prueba oral de 4 de noviembre de 2003, páginas 66 a la 67.

38. Transcripción de la prueba oral de 4 de noviembre de 2003, página 85.

39. Transcripción de la prueba oral de 5 de noviembre de 2003, página 22.

40. Transcripción de la prueba oral de 17 de diciembre de 2003, páginas 110 a 111.

41. Transcripción de la prueba oral de 17 de diciembre de 2003, páginas 121 y 122.

42. Transcripción de la prueba oral de 17 de diciembre de 2003, páginas 201 a 202.

43. Transcripción de la prueba oral de 23 de diciembre de 2003, páginas 69 y 70.

44. Transcripción de la prueba oral de 23 de diciembre de 2003, página 76.

45. Transcripción de la prueba oral de 23 de diciembre de 2003, página 79.

46. Transcripción de la prueba oral de 23 de diciembre de 2003, páginas 109 y 110.

47. Transcripción de la prueba oral de 23 de diciembre de 2003.

48. Transcripción de la prueba oral de 23 de diciembre de 2003, página 127.

**49.** Transcripción de la prueba oral de 23 de diciembre de 2003, páginas 94 a la 131.

**50.** Transcripción de la prueba oral de 23 de diciembre de 2003, páginas 9 a la 60.

**51.** La anterior conducta de Vanessa refleja precisamente la severidad de su condición mental, cuando a pesar de haber compartido íntimamente con el autor de los hechos por espacio de unas tres horas, lo confundió con dos abogados distintos y luego con un miembro del jurado. Téngase presente, que el proceso de vista preliminar particularmente, se llevó a cabo en tiempo razonablemente cercano a la fecha de los hechos.

**52.** Refiérase a la nota al calce número 41.

**53.** Transcripción de la prueba del 23 de septiembre de 2003, página 36.

**54.** P. de la S. 974.

**55.** No debe olvidarse que esa prueba, aunque de referencia, podía admitirse como prueba sustantiva, conforme a las Reglas 63 y 65 (w) de Evidencia. Además, se trató de evidencia admisible como declaraciones espontáneas por excitación, según la Regla 65(B) de Evidencia.

**56.** La Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV, R. 5, provee que:

*"No se dejará sin efecto una determinación de exclusión de evidencia ni se revocará sentencia o decisión alguna por motivo de exclusión errónea de evidencia a menos que:*

*(1) la evidencia fue erróneamente excluida a pesar de que la naturaleza, propósito y pertinencia de la misma fue traída a la atención del tribunal mediante una oferta de prueba o por cualquier otro modo, y*

*(2) el tribunal que considera el efecto de la exclusión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita."*

**57.** Este hecho de suyo derrota cualquier alegación de error de hecho. En la mente de cualquier persona ordinaria, tal internado **mínimamente** hubiera sembrado la duda sobre la capacidad de la interna para consentir y, por tanto, la posible aplicabilidad de la modalidad técnica del delito de violación. Se recordará que la Institución estaba debidamente rotulada con su nombre, el cual anunciaba el tipo de institución de la que se trataba.